NEW YORK & RICHMOND GAS CO. v. PRENDERGAST et al.

(District Court, E. D. New York. December 18, 1925.)

1. **Public service commissions** ⬅7—**Ascertainment of value of public utility's property relative to rates is matter of reasonable judgment.**

Ascertainment, for purpose of determining reasonableness of rates, of fair value of public utility's property is not a matter of formulas or artificial rules, but of reasonable judgment, based on proper consideration of all material facts.

2. **Gas** ⬅14(1)—**Elements of value of property for rate-making purposes stated.**

In determining fair value of gas company's plant for rate-making purposes, special master properly considered investment reproduction cost, fixed capital cost, and original cost of property, shown by company's books and by judgment of state Supreme Court, to which he

added subsequent additions and betterments and going concern value.

3. **Judgment** ⬅703—**Incumbent of public office concluded by judgment against predecessor respecting powers, privileges, and duties of office.**

Incumbent of public office is in privity with his predecessor, and is concluded by any judgment for or against predecessor in any suit involving powers and privileges or duties of office.

4. **Judgment** ⬅720—**State Supreme Court judgment determining fair value of gas company's property for rate-making purposes conclusive in subsequent suit.**

Judgment of Supreme Court of New York, determining fair value of gas company's property for rate-making purposes as of specified date, estopped parties thereto from contending to contrary in subsequent suit on different cause of action.

5. **Public service commissions** ⬅7—**"Going concern value" is property, for purpose of rate fixing.**

"Going concern value" of public utility is property, which cannot be taken except by due process of law, and hence properly considered for purpose of rate fixing.

6. **Public service commissions** ⬅7—**Undistributed structural costs and working capital should be allowed in determining value for rate-making purposes.**

In fixing fair value of public utility for rate-making purposes, undistributed structural costs and working capital representing actual expenditures should be allowed.

7. **Gas** ⬅14(1)—**Conclusion standard was unreasonable, arbitrary and unwarranted held supported by evidence.**

Rate and thermal unit standard prescribed for gas companies by Laws N. Y. 1923, c. 899, are inseparable, and master's finding that statutory standard of 650 British thermal units per cubic foot was unreasonable, arbitrary, and unwarranted by police power, *held* supported by evidence.

8. **Constitutional law** ⬅298(7)—**Gas** ⬅14(1) —**Maximum rates fixed for gas, and forbidding of service charge, held confiscatory.**

Laws N. Y. 1923, cc. 898, 899, prescribing maximum charges for gas of $1 and $1.20 per 1,000 feet, and forbidding a service charge for installment and use of apparatus, *held* confiscatory, and violative of federal Constitution.

9. **Gas** ⬅14(1)—**Eight per cent. held reasonable return.**

Annual return of 8 per cent. *held* reasonable rate of return for gas company.

In Equity. Suit by the New York & Richmond Gas Company against William A. Prendergast and others, constituting the Public Service Commission of the State of New York, and another, to have declared unconstitutional and void acts of the Legislature of the state of New York fixing the rate

to be charged for gas (Laws 1923, cc. 898, 899). On exceptions to the report of the special master. Master's report modified, and, as so modified, confirmed.

The opinion and report of Special Master Appleton L. Clark, dated July 3, 1925, are as follows:

This is a suit in equity, instituted by the New York & Richmond Gas Company against the defendants, who constitute, respectively, the Public Service Commission of the state of New York and the Attorney General of the state of New York, to determine the constitutionality of chapter 898 of the Laws of 1923 and of chapter 899 of the Laws of 1923, in relation to the price and quality of gas, and for a permanent injunction restraining the enforcement of such statutes. Injunctive relief was granted pendente lite, by the special statutory court, against the rate provisions of both chapters 898 and 899, including the requirement of $1 rate for gas of not less than 650 B. t. u. content.

This action was referred to me as special master, by an order of Hon. Marcus B. Campbell, United States District Judge for the Eastern District of New York, dated October 11, 1923, directing me to take the testimony and evidence upon the issues herein, make all needed computations, fully hear the facts, and report findings of fact and conclusions of law, together with the evidence.

In accordance with the order, and following conferences with the District Judge for the purpose of arranging hearings, so as not to conflict with hearings in other like cases, it was agreed that hearings should be held not less than three days a week, with morning and afternoon sessions, to comply with the order that the master should proceed as speedily as practicable. Hearings were begun on October 20, 1924, and continued until January 27, 1925, averaging five hours a day, at which there were taken 6,325 typewritten pages of testimony and 194 separately numbered exhibits were introduced by the parties. There will be filed the typewritten transcript of the testimony, together with the exhibits.

In accordance with the requirements of the order of October 11, 1923, and the accustomed practice in the trial of rate suits in equity in this district, I submitted to counsel for all parties on June 17, 1925, a preliminary draft of my report and findings. On June 24, 1925, I received from counsel preliminary written and verbal statements embodying their suggestions and criticisms regarding the matters covered by said preliminary drafts. Whereupon I proceeded to complete and file my report and findings in its final form, which is to be taken as embodying my report and findings.

Prior to the taking of testimony, and at all times during the progress of the hearings, the defendants, in compliance with the requirements of the order, had full and free access to the plant, buildings, and other properties of the plaintiff, used and useful in its gas business, as also to the documents and books of account kept by the plaintiff in its regular course of business. I visited and inspected the plant and property of the plaintiff in company with counsel for the respective parties and their engineers.

### Legislative Acts in Suit.

This suit is instituted to test the constitutionality of two legislative acts of the state of New York, both amendatory of the Public Service Commission Law (chapter 480 of the Laws of 1910) and of the acts amendatory thereof and supplementary thereto, being chapters 898 and 899, Laws of 1923:

(1) Chapter 898, Laws of 1923, entitled "An act to amend the Public Service Commission Law, in relation to charges by gas corporations," added a new subdivision 6 to the Public Service Commission Law, to read as follows:

"6. *Service Charges Prohibited.* Every gas corporation shall charge for gas supplied a fair and reasonable price. No such corporation shall make or impose an additional charge or fee for service or for the installation of apparatus or the use of apparatus installed."

This act took effect immediately on approval by the Governor, June 1, 1923.

(2) Chapter 899, Laws of 1923, entitled "An act to amend the Public Service Commission Law, in relation to the charge for illuminating gas in cities containing a population of one million or over," added a new section to the Public Service Commission Law, to be known as section 67-a, to read as follows:

"67-a. *Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per

cubic foot, measured under normal conditions of temperature and atmospheric pressure. The Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum."

This act became effective on approval of the Governor, June 2, 1923.

The provisions of these acts are both applicable to this plaintiff, and so, respectively, prohibit the plaintiff from making a service charge, from charging more than $1 per 1,000 cubic feet of gas furnished or sold, and from furnishing gas with less than 650 B. t. u. content.

Prior to the enactment of these laws in 1923 this plaintiff had instituted an action in the New York Supreme Court to determine the constitutionality of the then existing law fixing a rate of $1 for gas and also the constitutionality of a 22 candle power standard. That $1 rate and 22 candle power standard had been prescribed by chapter 125 of the Laws of 1906. This action was heard before Hon. Albert H. Sewell, as official referee, with the result that the rate statute, as well as the 22 candle power standard, were found confiscatory and unconstitutional as to this plaintiff. N. Y. & Richmond Gas Co. v. Nixon, as Public Service Commission, et al., judgment filed Richmond county clerk's office, January 10, 1921, appeals of defendants dismissed 203 App. Div. 861, 196 N. Y. S. 941, appeal of city of New York dismissed 204 App. Div. 838, 197 N. Y. S. 933, motion for reargument denied 204 App. Div. 894, 197 N. Y. S. 933, and motion for leave to appeal to Court of Appeals denied N. Y. Law J., February 3, 1923.

The final decree in the state Supreme Court action provided as follows:

"Fourth. That at any time while the injunction hereinbefore granted remains in force, any party hereto, or his or its successors or assigns, may apply, upon notice, at the foot hereof, to vacate or modify the foregoing injunction, if it can be shown that by changed conditions the statutory rate is no longer confiscatory in effect under such new conditions." Plaintiff's Exhibit 25, Judgment, Jan. 10, 1925.

The decree in that case did not limit the duration of the adjudication that the statutory rate of $1 was to be deemed unconstitutional, but, on the contrary, the defendant public authorities were given leave to have the injunction terminated upon a showing before the court of proper facts. No application has been made in behalf of the defendant public authorities to have the decree in the prior case in any way modified or changed.

### Organization of Plaintiff.

The plaintiff is a corporation organized and existing under the laws of the state of New York for the purpose of manufacturing and supplying gas for public and private consumers in the borough of Richmond, county of Richmond, city and state of New York, pursuant to a consolidation agreement made and entered into June 24, 1901, in compliance with the Business Corporations Law, known as chapter 567 of the Laws of 1890 (now Consol. Laws, c. 4), between plaintiff and the Richmond County Gaslight Company and the Richmond Gas Company.

By virtue of such agreement, the plaintiff became the owner of certain franchises to lay, construct, maintain and operate its mains, pipes, and conductors in the streets, highways, and public places in the First, Second, Third, and Fourth wards of the borough of Richmond. It further became the owner of such mains, pipes, and conductors and of the manufacturing plant and works for the manufacture and distribution of gas formerly erected, used, and operated by the predecessor companies, and is now operating in said territory.

The population of the territory served by the plaintiff was estimated, as of July 1, 1923, to be 103,229. On June 1, 1923, the plaintiff had 20,110 meters installed, of which 19,426 meters were on the average for the year actively in service. On September 30, 1924, the plaintiff had 23,287 meters installed, of which 22,324 were active and 963 temporarily locked. The peak of demand for gas occurs in the winter season, although it fluctuates throughout the year.

The holdings of real estate belonging to plaintiff on June 1, 1923, consisted of three parcels: One plot on the south side of Willow avenue; one plot on the north side of Willow avenue, with a frontage on Willow avenue and on New York avenue, Clifton, on which plaintiff's main manufacturing plant is erected; and one plot fronting on Columbia street and Post avenue, West New Brighton, on a part of which is erected a "district holder." Since June 1, 1923, the plaintiff has acquired two additional parcels, viz.: One plot on which is erected a three-story office building known as 691 Bay street, acquired since May, 1923; and one plot on Washington avenue, Van Name avenue and Simonson avenue, Mariners' Harbor, upon which it has erected a 1,000,000 cubic foot

gas holder, with a brick and steel boiler and governor house.

## Manufacturing Plant.

The Clifton plant consists of brick and steel buildings, with apparatus, employed in the manufacture of water gas, which embraced, June 1, 1923, one 9 foot set of U. G. I. water gas apparatus, having a capacity of 2,000,000 cubic feet a day; two 7 foot 6 inch sets of U. G. I. water gas apparatus, having a capacity in excess of 1,000,000 cubic feet a day each; one 6 foot set of U. G. I. water gas apparatus, with actual capacity of 500,000 cubic feet per day—making an aggregate capacity of 4,500,000 cubic feet per day. On June 1, 1923, the safe working capacity of the plant, allowing for shut-downs and repairs, was considered to be 2,500,000 cubic feet per day, although at various times gas in excess of that rate of capacity was produced.

Since June 1, 1923, one 11 foot set of water gas apparatus has been added, with a rated capacity of 3,500,000 cubic feet per day, which machine was continuously operated during 1924, except for the usual and recurrent repairs. This addition has increased the aggregate capacity of the machines to 8,000,000 cubic feet per day and increased the safe working capacity to 3,500,000 cubic feet per day.

## Holders.

The plaintiff has, at its main plant, one main gas storage holder of 1,000,000 cubic feet capacity, and on June 1, 1923, had a 200,000 cubic feet gas storage holder which since that time has been converted into a relief holder, and also has a 100,000 cubic feet relief holder. The plaintiff has at West Brighton, Post avenue and Columbia street, a storage holder with a capacity of 180,000 cubic feet.

On June 1, 1923, the plaintiff's aggregate storage capacity was 1,480,000 cubic feet. On September 1, 1924, plaintiff put in service a 1,000,000 cubic feet gas storage holder at Mariners' Harbor. At present the plaintiff's holder capacity is 2,480,000 cubic feet of gas.

## Distribution.

The maximum day's send-out of gas by the plaintiff for 1922, 1923, and 1924, was as follows:

1922 ....................2,620,000 cubic feet
1923 ....................2,944,000 cubic feet
1924 ....................3,111,300 cubic feet

The hourly demand, however, has exceeded the rate of 3,500,000 cubic feet of gas per day. Distribution, which is made through a high-pressure and a low-pressure system, comprised as of June 1, 1923, 141.8 miles of low-pressure gas mains, 5.7 miles of transmission mains, and 12.8 miles of high-pressure mains—a total of approximately 160.3 miles of mains.

## Gas Appliances.

The plaintiff does not rent but sells gas appliances, the gross profits so derived (the difference between purchase cost and sales cost) is credited to miscellaneous operating revenue.

## Capitalization as of August 31, 1924.

Bonds, at 6 per cent., outstanding. $2,125,000.00
Common stock ................. 1,500,000.00
Preferred stock ................ 364,400.00

$3,989,400.00

Of this total capitalization the Public Service Commission has approved $2,498,400 in par value of securities; the balance of $1,500,000 of common stock having been issued in 1901 upon plaintiff's organization, and prior to the creation of the Public Service Commission.

## Plaintiff's Outstanding Capitalization and Other Invested Resources.

As of December 31, 1922 ........$4,247,948.17
As of June 1, 1923............... 4,232,267.68
As of June 30, 1923 ............ 4,466,712.57
As of July 31, 1924 ............ 4,825,583.22

## Rate Base.

This plaintiff is constitutionally entitled to earn a just and fair return based on the present fair and reasonable value of its property used and useful in the manufacture of gas. "The cost of reproduction less accrued depreciation rule seems to be the one generally employed in rate cases. But it is merely a rule of convenience and must be applied with reason." Kings Co. Lighting Co. v. Willcox, 210 N. Y. 479, 104 N. E. 911, 51 L. R. A. (N. S.) 1.

The precise measure to be applied in the determination of such value has not as yet been definitely determined by the Supreme Court, although certain elements have been indicated as relevant facts. The Supreme Court of the United States, in Georgia Railway & Power Co. v. Railroad Commissioners of Georgia, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144, has held that "the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of con-

struction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case."

See the interpretation of this decision in the later phase of the case reported in P. U. R. 1925A, 546. See, also, San Diego Co. v. National City, 174 U. S. 739, 19 S. Ct. 80, 43 L. Ed. 1154;. San Diego Co. v. Jasper, 189 U. S. 439, 23 S. Ct. 571, 47 L. Ed. 892; Stanislaus County v. San Joaquin, 192 U. S. 201, 24 S. Ct. 241, 48 L. Ed. 406; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244; Bluefields W. Works v. P. S. C., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 39 S. Ct. 454, 63 L. Ed. 968; Southwestern Bell Co. v. P. S. C., 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed 981, 31 L. R. A. 807.

In the Bluefields Case and the Southwestern Bell Telephone Case, the court held that the Constitution protects value, and not investment, that cost or investment and value are not synonymous, and that reproduction cost and original cost are each relevant facts, to be given such weight in any valuation proceeding as the facts of the particular case may warrant, but that neither is to be taken as necessarily the exact measure of present value. "As to this [fair value] there must be a reasonable judgment based on a proper consideration of all relevant facts. * * * The reproduction rule is merely a rule of convenience and must be applied with reason." Brooklyn Borough Gas Co. v. Public Service Commission, 17 N. Y. State Dept. Rep. 81.

"The basis of the calculation is the 'fair value of the property' used for the convenience of the public. * * * The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." "The making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership, *and it is that property, and not the original cost of it*, of which the owner may not be deprived without due process of law." Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas 1916A, 18.

"And we concur with the court below in holding that the value of the property is. to be determined as of the time when the enquiry is made regarding the rates." Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034. By a long line of decisions, of which Monroe, etc., Co. v. Michigan (D. C.) 292 F. 139, is one of the latest, reproduction costs less depreciation is the dominant element in rate base ascertainment." N. Y. Tel. Co. v. Prendergast (D. C.) 300 F. 822.

In the determination of the fair value of plaintiff's property used for the convenience of the public, as a rate base I have taken proof as to original cost to the plaintiff, investment, reproduction cost, cost of fixed capital as shown by books of account, including additions to October 31, 1924, the capitalization of the company, the probable earning capacity of the property under the rates prescribed by statute under consideration, and the sum required to meet operating expenses. I have made findings as to same, and in the exercise of a reasonable judgment in the consideration of such relevant facts have found what I regard as the present fair value of the plaintiff's property used and useful in its manufacture and distribution of gas.

### Land.

The plaintiff owns and uses two plots of land at Stapleton upon which its gas plant and gas storage facilities are located. The plot on which the plant is erected is bounded by Willow avenue, Bay street, and the right of way of the Staten Island Railway Company, with a frontage of 539 feet 2 inches on Willow avenue and 91.16 feet on Bay street. It is an exceedingly irregular piece, of which the content in square feet equals 52 lots, which plaintiff's expert valued on the basis of $3,000 per lot as of June 1, 1923, a total valuation of $156,000. This same plot, with the exception of an irregular shaped piece of land purchased by the plaintiff in 1922 through the witness as broker (the purchase price not being recalled by the witness), was valued on the former rate trial by this same witness, in 1920, at $100,000. The plot of land on the southerly side of Willow avenue carries a gas holder, and has a frontage of 149.71 feet on Willow avenue and a depth of 144.72 feet. Plaintiff's expert

testified that the area of this plot equalled 8⅓ lots, in which estimate he included the 144 feet depth as part of a front foot lot, and valued the same on the basis of $1,250 a lot, or a total valuation of $10,500; the same plot having been valued by him in the 1920 proceedings at $9,000.

These two plots are located a short distance from the shore of New York Bay and in no sense may be regarded as water front property. The main piece is connected with the water front by pipe line, without which the witness admitted that he did not know what access to water front the property could have. And another of plaintiff's witnesses stated: "This plant was so far away from the water front that that was not considered at all" in determining the existence of piling under the plaintiff's buildings. Considerable of this expert's testimony referred to water front sales for the purpose of establishing values, to which, under the circumstances, I have not accorded much weight.

The third piece of real estate embraced in the land value is a tract at the southwest corner of Post avenue and Clove road, upon which is erected a gas holder and a substantial brick building for use of the company's representative at that location. This piece of land shows a frontage of 487.93 feet on Post avenue and 119.14 feet on Clove road, and is valued by Mr. Kolff at $32,600, on the basis of 3 lots at $2,500 each, and the corner piece at $5,000 on Clove road and 16 lots, at $750 each, on Post avenue—a total valuation of $32,600. This plot was valued by ·Mr. Kolff on the former trial at $18,000.

Judge Sewell on the former trial found that there should be excluded from this plot, as not necessarily used and useful in plaintiff's business, that portion between Clove road and the fence east of the holder, being 321 feet on Post avenue and 118 feet on Clove road. I find that said portion is not required in the conduct of plaintiff's business, it being used at one end only for the storage of a small amount of pipe, accommodation for which could be found on that ·portion of the land on which the holder is ·erected.

The defendants offered no evidence as to land values, and I therefore have only the testimony of plaintiff's expert, who values plaintiff's land in the present trial at $199,-100, whereas five years ago he valued the same land at $127,000, being an increase of nearly 60 per cent. in five years. From my knowledge of real estate in this borough, I may add that I know of no conditions which would warrant or sustain so great an increase in the value of this land as Mr. Kolff thinks has taken place since he last testified. Taking into consideration, also, the value of the real estate as found by Judge Sewell, in 1920, at $115,000, I now find, from all the evidence and surrounding facts and circumstances, that the value of plaintiff's real estate used and useful in the manufacture of gas, as of June 1, 1923, is the sum of $150,000.

### Buildings.

Mr. Henry R. Burt, a contracting engineer, vice president and secretary of the Northeastern Construction Company, qualified as an expert and testified in great detail in regard to the reproduction cost new of the plaintiff's buildings, including all foundations and excavations, except the foundations for the holders and machinery. He testified that he applied unit prices as of June 1, 1923, the same being the market prices for material and labor as of that date for the territory of the plaintiff company. He also testified that the inventory and appraisal prepared by him, together with a supplemental exhibit showing the requisite repair and restoration work as of June 1st and its cost, "puts the buildings in condition equal to new"; "places the buildings as they are now in a condition equal to new." Mr. Burt further testified that he had based his figures for a bid on close competition, on the basis of a subcontractor doing work for a general contractor.

This inventory and appraisal (Exhibit No. 91) which includes 43 typewritten pages of detailed estimates and totaled the sum of $197,437.88, was closely scrutinized by defendants' counsel, on a protracted cross-examination, and as a result showed only three errors in minor details, consisting of two excessive amounts, due to errors in computation, aggregating $17.39, and an omission, by oversight, of the cost of a concrete runway, which Mr. Burt testified should have been included, amounting to $416.06. This resulted in a net addition of $398.67 to be included in the appraisal, making a revised total of estimated cost, to reproduce new the buildings and their equipment, the sum of $197,836.55.

No witnesses were put on the stand by defendants to controvert the plaintiff's evidence. The defendant commission, however, questions the accuracy of Mr. Burt's "common labor" unit, of 62½ cents per hour, as compared with payments made by plaintiff

to Panoni, a contractor for work done, at 60.3 cents per hour. It was shown, however, that plaintiff had paid to Panoni, June 7, 1923, for labor at 65 cents per hour, and Mr. Burt testified that the rate adopted by him of 62½ cents per hour was the minimum current rate charged for union labor.

As I am of the opinion that an undertaking of the magnitude involved in the construction of this plant would undoubtedly be governed by union rates, I consider that Mr. Burt's labor unit of 62.5 cents per hour is not excessive, and accordingly I find, from the evidence, the reproduction cost new of the buildings and equipment to be $197,836.55.

### Mains and Services.

The reproduction cost new of the plaintiff's system of mains and services was established by the testimony of Mr. Simpson, general superintendent of mains and services of the Consolidated Gas Company of New York, a properly qualified expert witness for plaintiff, of unquestionable standing in his profession.

The distribution system, consisting of the mains and services used by the plaintiff, constitutes a part of the plaintiff's records, appearing in plaintiff's mains and service record books and in an atlas showing the streets and locations of such subsurface structures. Mr. Simpson after examination of these records, personally picked out and selected, approximately, 20 different points at which he made excavation for verification and inspection of the existence, location, size, and nature of the mains. He accordingly found that in all cases the location, size, and actual existence of the structures underground checked up and were in substantial agreement with the company's records. He therefore accepted the company's figures as to the total quantity of mains of the various sizes as of June 1, 1923. The witness further examined the soil and subsurface conditions with regard to their effect on the cost of laying the mains.

In the Plaintiff's Exhibit No. 97, which consists of schedules, showing the estimated reproduction cost of labor and material necessary for reproducing and laying the plaintiff's mains and services as of June 1, 1923, the number and quantity of the mains and services is based on the company's books, the cost of material and of labor is the witness' estimate of the average cost of labor and material based on current market prices as known to him existing in the territory of plaintiff's operations as of June 1, 1923, and includes employees' and public liability insurance on labor, and the cost of pavement and city inspection actually paid for by the company as appears in plaintiff's books of account, and also the cost of existing governors and governor pits. The field overheads are included in "material and labor." Mr. Simpson did not include in his estimate any allowance for contractor's or subcontractor's profit, or any other undistributable structural costs, except such field overheads as pertain only to the laying of the mains and services. Mr. Simpson's appraisal of reproduction cost new as of June 1, 1923, amounts for mains to $1,872,138.02, and for services to $508,239.18.

Mr. Simpson testified that he found the pipes and joining material in very good physical condition as materials, and that the mains were in most excellent condition, apparently very well maintained, and appeared to be as good as new. He further testified that he had never seen a main go out of service, but for obsolescence or inadequacy, and that he had seen mains taken out of the ground, which had been laid in 1820 or 1830, showing no signs of deterioration. While this physical examination of the mains was made only at the 20 excavations made by him, and at certain other openings made by the plaintiff in connection with its current work, I consider it afforded the witness under the circumstances a fair and sufficient opportunity to observe and note the general physical condition of the mains.

Mr. Simpson described his method of arriving at the subsurface conditions under which the mains and services would have to be laid, by testifying that in this territory, consisting of over 160 miles of mains, different kinds of soil, different street and paving conditions, different condition as to rock, are naturally met with, and that therefore he had averaged these conditions, rather than attempt to reproduce each main separately under the conditions obtaining in each street. The low cost of laying mains in a sandy section, with easy digging, he averaged with the high cost of laying mains requiring rock excavation, estimated at an average of 1 per cent. for the total excavation. This allowance for rock within 3 feet of the surface, considering the nature of the territory, I consider a fair allowance. In the laying of services he did not consider rock excavation as an element, as most of the rock would be excavated at the time when the mains were laid.

He found that all pipes other than straight pipes, and known as "specials," represent

3 per cent. of the total weight of the pipe, and that the average length of services is 44 feet. While he estimated on no rock excavation for services, he included a separate excavation for services, as the mains and services could not be installed simultaneously; it being necessary to purge the mains before the services were laid and connected, and the main excavations would have then been already back-filled.

The unit price for common labor was 60 cents per hour, which he testified was lower than the prevailing rate and the city rate. He cited the rate paid by a contractor, Donovan, at 62½ cents on street work and 70 cents on trench work, and of another contractor, Johnson, 65 cents for street work, Panoni, 65 cents and 70 cents, and the city of New York on road repair work 62½ cents. The rate of 55 cents paid by plaintiff was accounted for by him as a wage for steady and permanent employment, with sick and other benefits offered by such a public utility; these rates being as of approximately June 1, 1923.

Mr. Simpson's unit prices for a reasonable market price of pipe as of June 1, 1923, according to quotations furnished by United States Cast Iron Pipe & Foundry Company and the Warren Foundry, are as follows: 6-inch pipe. $69.60 per ton, delivered New York; 3-inch pipe, $78.60 per ton, delivered New York; 4-inch pipe, $71.60 per ton, delivered New York; 8-inch pipe and above, $67.60 per ton, delivered New York.

Counsel for defendant company offered in evidence published quotations of gas pipe from two trade journals—the Gas Age Record, issue of June 2, 1923, and the Iron Age, issue of May 31, 1923, which were received in evidence as Defendants' Exhibits A–48 and A–49, respectively.

The item from Gas Age Record, at page 724, reads as follows: *"Quotations. Cast Iron Pipe.* New York quotes 6″ and larger, per ton $58.50; 5″ and 4″, $63.00; 3″, $68.-80; and $4.00 additional for Class A and gas pipe." And from the Iron Age, p. 1590: "We quote per net ton, f. o. b. N. Y. in carloads lots as follows: 6″ and larger, $58.50; 4″ and 5″, $63.00; 3″, $68.80, with $4 additional for class A and gas pipe." A comparison of these prices is as follows:

| As of June 1, 1923. Mr. Simpson. | Date of Pub. June 2, 1923. Gas Age Record. | Date of Pub. May 31, 1923. Iron Age. |
|---|---|---|
| 6″ ..........$69.60 | $62.50 | $62.50 |
| 3″ .......... 78.60 | 72.80 | 72.80 |
| 4″ .......... 71.60 | 67.00 | 67.00 |
| 8″ and above 67.60 | 62.50 | 62.50 |

The figures in this tabulation from the two journals include "$4 additional for gas pipe." Plaintiff claims that these quotations do not reflect the market, by reason of a considerable lag in the quotations, and that these publications did not report the current changes in price. Mr. Simpson testified: "There is a considerable lag in their reporting changes in prices, in those periodicals. They are very very slow. * * * I know that $58.50 (6-inch pipe) plus $4 is not right as an average; I know the differential of $4 is $1 too low. I know that, and therefore I say these prices are unreliable." And again: "The quotation obtained from the foundries did not match, as was seen here, with the quotations in the books, and then it was endeavored, and I endeavored, to find out just why that was. I ascertained from the publishers of those magazines and others of that character that there was a very considerable lag in their reporting the changes in price, and that they had not reported the current changes in price, and were not reporting the market price as of June 1st." He testified that, for making estimates for mains for the companies by which he is employed he had not relied for current prices of pipe; that the lag was about 4 months' average—in one case it amounted to 6 months; "they merely had this set up and were publishing it right along."

While I consider Mr. Simpson's sworn testimony in regard to the cost of pipe of greater probative force than the aforesaid pipe quotations, I regard Mr. Simpson's prices as a little full. They exceed the published quotations for 3-inch pipe by $2.90, for 4-inch pipe by $2.30, and for 6-inch pipe by $3.55. I therefore fix as a fair price for the pipe the following: For 3-inch pipe, $75.70; for 4-inch pipe, $69.30; for 6-inch pipe, $66.05; and for 8-inch to 16-inch pipe, $65.05. Such is a brief review of plaintiff's evidence, uncontroverted by the testimony of a single witness in behalf of the defendants.

The defendant commission, however, claimed that labor-saving devices, in an operation as extensive as the laying of 168 miles of mains, should have been provided for rather than the doing of the work by manual labor. When this was urged under the defendants' cross-examination of Mr. Simpson, he testified, referring to such labor saving devices: "I have found that their value lies not in a saving of money, and it costs a little more, as a general proposition, per unit of excavation, but their value is in times

of labor shortage. * * * I assume no labor shortage, * * * and, if men were available, the cost of excavating by machine would have been more than the cost which I have taken by hand."

This stands uncontradicted by any evidence, and I accordingly take it as established that these labor-saving devices would have increased the reproduction cost rather than have reduced it. The record in my opinion fails to contradict or disturb in any respect the estimates of reproduction cost as of June 1, 1923, as testified to by Mr. Simpson, except in regard to his unit cost of pipes, which I have revised as above noted, and have had submitted to me a revised estimate based on cost of pipe as found by me, and I therefore adopt Mr. Simpson's figures, modified as indicated, as and for reproduction cost of mains in the amount of $1,845,-913.60, and of services in the amount of $508,239.18, as of June 1, 1923. Whether, however, reproduction cost should be adopted as representing fair value in establishing a rate base or some other basis be adopted, lies in the exercise of proper judgment bearing in mind, however, that reproduction cost is to be regarded as a dominant factor.

The counsel for defendant commission has with evident industry and care presented in his brief calculations and schedules elaborating an estimate of the cost of mains which he fixes at $708,975 as of January 1, 1924. This estimate involves extensive calculations based on units deduced, as claimed, from the company's books and annual reports made to the Public Service Commission for 1922 and 1923, covering the construction of extensions of 27,885 feet in, as he asserts, all the different soil conditions prevailing in Richmond county. He then builds up, on such data, as he claims, a reproduction cost of the total mains included in Mr. Simpson's schedules at actual cost of installation in 1922 and 1923, as reported to the commission, and in comparison with Mr. Simpson's schedules shows a difference in favor of the defendant commission of $382,070.75.

I do not consider it proper to accept these figures other than as a possible aid in reaching a determination. The defendants should have substantiated their claim through the medium of sworn witnesses, after the opportunity for cross-examination had been afforded to the plaintiff. Furthermore, I do not consider that the cost of making extensions is a fair test of the cost of constructing or replacing the entire distribution system. I accordingly find, from the evidence presented, that the fair reproduction cost of the mains and services is the sum of $2,354,152.78, which includes the amount paid by the company for the actual paving done by the company and for city inspection as shown by the plaintiff's books.

### Gas Manufacturing Plant and Holders.

Col. Alten S. Miller, who has had a long and extensive practical experience in the construction and operation of almost every kind of public utility property, gave testimony for the plaintiff as to what, in his opinion, it would cost to reproduce new the material and labor elements of the manufacturing plant and holders actually used and useful in plaintiff's business of gas making as of June 1, 1923, and he estimated this figure at $604,300. The defendants offered no evidence to controvert the plaintiff's testimony in that regard.

The defendant commission urges in its brief that labor-saving devices should have been installed; they question the plaintiff's business methods, urging that the present plant is in some respects not up to date and uneconomical, that it should have two 11-foot sets only, and that no competent gas engineer would erect new, as of June 1, 1923, a replica of this plant to operate in competition with it. It was established at the trial that this plant is as good as new and 100 per cent. efficient, and no evidence was introduced to show that the management was inefficient or had not shown proper business judgment and ability in the conduct of its affairs. Mr. Welsh, the plaintiff's president and manager, on the other hand, proved, to my satisfaction, that the management was sound and efficient.

In this connection I refer to the court's opinion in the Southwestern Bell Telephone Case, as follows: "It must never be forgotten that while the state may regulate, with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in State Public Utilities Commission ex. rel. Springfield v. Springfield Gas & Electric Company, 291 Ill. 209, 234 [125 N. E. 891]. The commission is not the financial manager of the corporation and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers." See Inter-

state Commerce Commission v. Chicago G. W. Ry. Co., 209 U. S. 108, 28 S. Ct. 493, 52 L. Ed. 705; Chicago, M. & St. P. R. Co. v. Wisconsin, 238 U. S. 491, 35 S. Ct. 869, 59 L. Ed. 1423, L. R. A. 1916A, 1133; People ex rel. v. Stevens, 197 N. Y. 1, 90 N. E. 60; Southwestern Bell Telephone Co. v. Public Service Com., 262 U. S. 276, 289, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807.

It would seem from its brief that the defendant commission would not erect this plant, but another "up to the moment" in every detail, with the latest improved methods known in the art of gas making as of June 1, 1923. How would such a plant constitute a measure of value of the plant and property of this plaintiff, gradually built and developed from time to time, the value of whose used and useful property is the subject of investigation and determination? This identical property and not another property is to be valued, the reproduction cost of which is the dominant element in the fixing of its value.

In the light of the evidence submitted and after full consideration thereof, I see no reason to disturb the reproduction cost testified to by Col. Miller, and I accordingly find such reproduction cost new of the gas-manufacturing plant and holders used and useful in the operation of plaintiff's business to be $604,300, without deduction for depreciation.

#### Meters.

Plaintiff's stock of meters, June 1, 1923, consisted of 20,110 on the district, valued by Col. Miller at $275,180.19, and 2,017 meters in company's storeroom, valued at $22,186.40, a total of $297,367. This being cost new for meters, Col. Miller stated that the unit of cost for meters on the district and in storehouse was the same; the apparent difference being that those on the district included cost of installation, the cost per meter on the district of $11.53 per meter representing $7.78 cost of meter delivered, including cost of testing, and $3.75 cost of taking out of storeroom, transporting to job, setting up, and connecting same. Ccl. Miller testified that he obtained these installation figures from Mr. Welsh and Mr. Kohout, officials of the plaintiff company.

It appeared from his testimony that a meter has no ascertainable average life, its period of service depending mostly on how it is maintained. If repairs are neglected, a new meter might last only 25 years. He made no investigation from the company's record as to how long the meters in the district had been installed, and made no allowance for expenditures to put them into condition equal to new. He testified that the effect produced by corrosion is the usual reason for withdrawing a meter. If placed in a damp place and not more or less frequently painted, it gets to a point "where it just does not pay to repair it; it is cheaper to put in a new meter than to repair it."

Col. Miller stated that he examined "I should say about 100 or 110" of those 20,110 meters on the district, and examined about 1,500 meters in the storeroom in two or three hours; he testified that, without having examined the 18,000 meters, he was prepared to testify that their condition was as good as new. He allowed nothing for depreciation of meters, although he admitted that in case of corrosion, which may occur as to a meter if installed in a damp place, it is oftentimes cheaper to put in a new meter than to repair it. I do not feel that Col. Miller's testimony in regard to the condition of the meters is conclusive or entitled to great weight. He has valued the meters, including their installation, at $297,367.

The defendants offered no evidence to offset or controvert what was brought out by Col. Miller, and, considering the very general nature of Col. Miller's testimony, I am somewhat at a loss in fixing the fair value of the meters. I had substantially no proof before me as to the life of a meter, or as to the causes which may produce its deterioration at any given time, other than Col. Miller's statement that, if neglected, it might last 25 years. It appeared, however, that the company spent in the year 1923 the sum of $18,929.21 for repairs of 4,431 meters. In view of all the evidence submitted, and the incompleteness of the proof as to the present condition of these meters, I consider a fair value for same to be $225,000.

#### General Equipment and Tools and Implements.

Col. Miller included in his estimate for general equipment and tools and implements the cost of same as shown by the books of the company, and he testified that these items, together with the other items making up the entire appraisal, represent reproduction cost as of June 1, 1923, and that such cost had not substantially changed since then. No testimony whatever was put in by defendants to refute the evidence submitted, although the defendants claim an allowance for depreciation. As it is the practice of the company to retire its property when no longer serviceable at 100 per cent. of its cost, or as near thereto as ascertainable, and as

the figure testified to by Col. Miller is the cost price for this property as shown by the books, on all the evidence presented I allow for general equipment and tools and implements $32,014.

### Working Capital.

This item of value is defined by Col. Miller, an opinion witness in behalf of the plaintiff, "as the floating or mobile capital required in addition to the fixed capital. It may be in the form of current assets or in the form of materials and supplies. For the efficient and economical carrying on of the multitudinous transactions of daily operation, money has to be put into things which are not reflected in the fixed capital accounts as of any particular date of inventory, and a reservoir of cash has to be kept on hand, so as to handle current transactions promptly and economically. These elements of outlay and investment—representing gas business—are grouped as 'working capital,' to the end that they may be included in the property and investment upon which a rate yielding a fair return is to be computed." He testified that in his opinion the plaintiff reasonably required $344,146 for working capital as of June 1, 1923.

Mr. Kohout, plaintiff's treasurer, testified that the average of working capital for the three years ending July 31, 1924, was $358,428.73, and he presented a detailed schedule of items constituting working capital which included "cash," "accounts receivable," "materials and supplies," "prepaid and suspense items," and "gas supplied, but not billed." Mr. Allison, an experienced adviser and consultant in public utility matters, in his testimony introduced in behalf of the plaintiff, said that these items should properly be included in determining the amount required for working capital. The defendants offered no testimony to contravene the plaintiff's claim, but they urge that the amount of accounts payable should be eliminated, and that the plaintiff's claim is excessive in amount.

This claim as to the propriety of deducting accounts payable seems to have been effectually disposed of in the case of Bronx Gas & Electric Co. v. Public Service Commission et al., 28 N. Y. St. Dept. Rep. 329, 364, affirmed by the Appellate Division for the First Department. The referee in his opinion there stated: "All working capital, including amounts tied up in accounts receivable, is capital actually being employed in the service of the public, and as such is entitled to be included in the category upon

10 F.(2d)—12

which a return is to be computed. It matters not whether the company which owns this capital is heavily indebted or whether or not it is solvent or insolvent. The amount of the plaintiff's capital devoted to the service of its consumers is not affected by the form or amount of the plaintiff's obligations. In determining what amount of capital is in use in the service, it is improper and unnecessary to deduct any sum of any kind on the opposite side of the balance sheet."

Judge Sewell found and fixed the working capital in 1919 at $200,000. At that time the company produced annually about 553,690,900 cubic feet of gas. The company produced June 1, 1923, annually about 713,-000,000 cubic feet of gas, representing an increased production of about 160,000,000 cubic feet. Accordingly it is my opinion that an increase in working capital over the amount fixed by Judge Sewell, based on the increase in production since that time, should be made, and I accordingly find, on the evidence and surrounding facts, that $275,000 represents a fair working capital for this company as of June 1, 1923.

### Going Value.

The cost of co-ordinating the plant and personnel, and of attaching the business, may be indicated as Judge Miller has expressed it in the Kings County Lighting Co. Case, 210 N. Y. 479, 104 N. E. 911, 51 L. R. A. (N. S.) 1: "The company starts out with the 'bare bones' of the plant, to borrow Mr. Justice Lurton's phrase in the Omaha Waterworks Case [218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084], supra. By the expenditure of time, labor and money, it co-ordinates those bones into an efficient working organism and acquires a paying business. The proper and reasonable cost of doing that, whether included in operating expenses or not, is as much a part of the investment of the company as the cost of the physical property." Or, as the federal court expressed it in N. Y. Tel. Co. v. Prendergast (D. C.) 300 F. 822: "It is found that this plaintiff was created, and does function, and functions very well; therefore it has going value, because it goes well. The amount may be difficult of ascertainment, but that going value exists is self-evident."

Going value may, in my opinion, be defined as the difference between what a prospective purchaser would pay for a fully completed and equipped plant ready to operate, but which in fact had never operated, and one fully completed and equipped,

which was actually operating, with an established business, as a going concern. The dominant and relevant fact in determining this element of value is not its original cost, or the expense of acquisition, but rather the actual present value of the elements now owned and possessed, and the present replacement cost of these elements, if they were not already possessed, is an important factor in weighing their present worth.

In approaching the question of valuation of this intangible but very definite property, which must be fixed and included in the rate base, I confess that I find myself much in the same state of mind as that expressed by the federal court in Westinghouse Elec. & Mfg. Co. v. Denver, etc. (D. C.) 3 F.(2d) 285, 26 Rate Research, 67, where the court states: "I am firmly of the notion that each of these witnesses knew much more about what it would probably cost to put a skeleton street railway plant in successful operation than I do. I know nothing on the subject. I am sure they each knew a great deal." And the court accepted the lowest amount named in the testimony.

As the defendants offered no proof whatever, the only amount named in the testimony was that expressed by Col. Miller, plaintiff's expert witness, who named the sum of $700,000 for going value, and by Mr. Welsh, the president and general manager of the plaintiff, who has been actively identified with the gas industry for about 34 years, and is fully conversant with the history of the plaintiff in all its relations, at least for that period of years, who estimated the going value at the sum of $725,000.

Counsel for plaintiff in their main brief have submitted a tabulation of some 31 cases in which the element of going value was considered; this tabulation showing the ratio between the amount allowed for going value and the total amount found for the physical property. Of the cases listed, 14 were court cases and 17 commission cases. The former are summarized to show an allowance for going value averaging 12.13 per cent. of the total property, and 11.7 per cent. in the latter. These cases I have considered only as judicial precedents of cases in which the existence and substantial worth of this element of property has been recognized and allowed.

Special Master Graham, in the case of Consolidated Gas Co. v. Prendergast, whose report and findings have been confirmed by the United States District Court, allowed for going value a sum approximating 10 per cent. of the value of the tangible property, this allowance being for business carried on in closely settled boroughs in the city of New York. I do not think that percentages from other cases are pertinent here, except to demonstrate the trend of decision and to check my own figures. Each case has to be considered on its own facts.

Considering the territory in which this plaintiff operates, consisting of aggregations of former villages fairly well populated, but not densely so, and frequently involving considerable intermediate open country, and on the evidence and the surrounding facts and circumstances, I consider an allowance of $644,000 fair and proper, and I accordingly allow such sum for going value, which is properly to be included in the rate base. Southwestern Bell Tel. Co. v. Fort Smith (D. C.) 294 F. 102; Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649; Des Moines Gas Co. v. Des. Moines, 238 U. S. 153, 169, 35 S. Ct. 811, 59 L. Ed. 1244.

The counsel for the defendant Attorney General urges that the amount allowable to this plaintiff for going value should be reduced, because of the fact that the present company did not itself build up and acquire all of the intangible elements of going value now possessed and used by it, but purchased a part of these properties, along with the plant and distributing system as it then stood, from predecessor companies in 1901. That in itself would be no reason for disallowing or reducing the amounts proved for going value. In my opinion, the test is the amount of the elements and advantages now possessed by the plaintiff, not the corporate source from which the plaintiff acquired them. On the other hand, the fact that the plaintiff purchased and took over physical and intangible properties which were then being operated as going concerns does require a certain caution now, in estimating the worth of the going value of the present enterprise.

The going value of the predecessor companies was undoubtedly a part of the property, tangible and intangible, acquired by the plaintiff in 1901, and entered into the price then paid for the aggregate of the properties then existent. To the extent that original cost is given weight as one of the elements in determining the present value of the physical properties to the present company, care must be taken to see to what extent the total purchase price paid by the plaintiff in 1901 enters into the book cost of the properties to date. If weight is given to an original cost figure, in that connec-

tion, which may include some payment for the going value up to 1901, care should be taken to avoid any duplication, in calculating the present worth of all the elements now possessed, from whatever source derived. This I have been careful to do, in reaching the sum of $644,000, instead of the larger sums shown by the uncontradicted evidence.

I am impressed, however, with the fact that there is not, and cannot be, any mathematical formula or method for computing the amount and present worth of going value. In the absence of demonstration through an actual purchase and sale transaction, under fair conditions, its ascertainment must be a matter of competent business judgment as to what a purchaser would be willing to pay for such elements and properties, rather than undergo the costs of acquiring them anew. It is the common necessity and practice, in the business world, to make estimates of the present worth of intangible properties which are no less difficult than any estimate in this case. The courts often have to make such ascertainments, as best they can, from all of the evidence, when dispute arises.

### Present Value of Plaintiff's Property—Original Cost.

Judge Sewell found, from the books of account of the plaintiff, after consolidation in 1901, that an item appeared therein "Plant and Property" $2,337,234.24, which I take as an approximation of the original cost of the property to the plaintiff. Judge Sewell found that the cost to the plaintiff of all fixed capital acquired by it, exclusive of working capital, per the books of account on January 1, 1920, amounted to $3,393,-720.89; adding net additions to October 31, 1924, $900,089.44—total cost of fixed capital to plaintiff, $4,293,810.33.

### Reproduction Cost Found in the Prior Suit.

Judge Sewell found that the reproduction cost of the plaintiff's property, exclusive of land and working capital, was as follows:

January 1, 1914, not less than.....$2,425,000.00
January 1, 1917, not less than.... 2,245,945.00
January 1, 1920, not less than .. 2,928,552.00

### Reproduction Cost Established Before Me.

The plaintiffs in this action claim for reproduction cost as of June 1, 1923, excluding land, working capital, undistributed structural costs, and going value, $3,511,496.00. As above discussed in detail, the testimony before me justifies a finding by me of reproduction cost, as of June 1, 1923, of the following items, viz.:

| | |
|---|---|
| Buildings ......................... | $ 197,836.55 |
| Mains and services ............. | 2,354,152.78 |
| Manufacturing plant ............ | 604,300.00 |
| To which should be added: | |
| Land ......................... | 150,000.00 |
| Meters ....................... | 225,000.00 |
| General equipment ............. | 32,014.00 |
| Working capital ................ | 275,000.00 |
| Going value ................... | 644,000.00 |

Minimum reproduction cost, without depreciation ..............$4,482,303.33

The testimony presented by the plaintiff shows that the property is maintained in good condition and is 100 per cent. efficient in performing its functions in the manufacture and distribution of gas. This testimony, however, shows that an additional cost would be necessary for the purpose of putting the properties "in the condition that they were in when new in a plant which was in full practical operation," or the "cost to put the present buildings as they now exist into a condition equal to new," as explained by Mr. Burt and by Col. Miller. The aggregate of such cost amounts to the sum of $18,281.91, which must be deducted from the reproduction cost.

In conformity with the opinion of Judge Campbell in the Brooklyn Union Gas Co. Case, 7 F.(2d) 628, and the findings confirmed and adopted by Judge Winslow in the Consolidated Gas Co. Case, I have deducted, in ascertaining the present value of the plaintiff's properties, the sums testified to by competent contractors as the cost of restoring the properties to condition equal to new. This was the only testimony adduced before me which afforded any indication or measure of actual deterioration in these properties, and it was the undisputed testimony that the properties were maintained in a high state of operating efficiency, through the making of repairs, renewals, and replacements as needed. If any further depreciation had in fact taken place as to this plant and distributing system, the defendant public officers would doubtless have presented evidence as to its existence and amount. As Judge Campbell said in the Brooklyn Union Gas Co. Case, they had "a large corps of experts under their control," and "could have easily shown the fact, if such it be." They must be deemed to have furnished to this court proof of any facts, within their knowledge, which would tend to refute or diminish any of the plaintiff's claims. In the prior case of the plaintiff before Judge Sewell, up-

on the facts there found, the court does not appear to have made any deduction for theoretical or accruing depreciation.

Counsel for the plaintiff do not concede that even the admitted costs of restoration to condition new should be deducted. They say that these sums represent only the amount of deferred maintenance at any time observable and not yet made good in the normal course. Nevertheless, under the decisions, I deduct the sums so testified to, and point out that no proofs were presented which showed the existence of any depreciation not counteracted by the continuous process of repair and replacement. The mere lapse of time since this plant was established or the units have been installed has not been shown to have decreased the value of the property as a whole as it stands to-day.

### Undistributed Structural Costs.

This leaves for consideration undistributed structural costs, which the plaintiff claims amounts to the sum of $1,114,814. This amount was estimated by Col. Miller and rested largely upon his opinion as an expert in the light of his experience and qualifications, but was not charged to specific accounts in the plaintiff's books or sustained by any mathematical calculation of the expenditures comprising that amount. While it is probably not essential to establish the fact that the plaintiff itself expended such an amount and charged it to capital, for, as I understand it, the undistributed structural costs represent costs which would normally be incurred in the creation of a plant and physical property similar in all respects to those of the plaintiff, nevertheless I feel that, in an action such as this, instituted to determine the confiscatory effect of certain statutes, it is desirable, within reason, possibly to understate rather than overstate the element of value described in the proofs in this case as undistributed structural costs.

Taking into consideration the range of percentages which have been allowed for this item in the various cases cited in the briefs of the parties, in view of all the probative evidence before me, I have concluded to fix and do hereby fix as a proper allowance for such undistributed structural costs the sum of $700,000. I accordingly find from the evidence presented that the reproduction cost new as of June 1, 1923, of the plaintiff's property used and useful in the manufacture and distribution of gas of every kind and description, with proper allowance for all items after depreciation, is:

| | |
|---|---|
| The above total of................. | $4,482,303.33 |
| Less cost to make new as above stated ..................... | 18,281.91 |
| Total reproduction cost...... | $4,464,021.42 |
| To which add undistributed structural costs ................. | 700,000.00 |
| Total as of June 1, 1923..... | $5,164,021.42 |

In addition to such sum, the plaintiff has made further expenditures of money for additions to its plant applicable to the present value of its used and useful property as follows: The net sum of $34,212.46 during the period from June 1, 1923, to December 31, 1923, and the further net sum of $448,869.79 during the period from January 1, 1924, to October 31, 1924. I therefore further find that such costs for additions should be added to the reproduction cost of June 1, 1923, as above found, and that accordingly the total reproduction cost of the plaintiff's property is as follows:

| | |
|---|---|
| As of December 31, 1923....... | $5,198,233.88 |
| As of October 31, 1924.......... | 5,647,103.67 |

Upon the trial, the plaintiff offered to prove that there exists an aggregate deficiency in the plaintiff's earnings, under the rates charged by the plaintiff during the period when the plaintiff was prevented by the acts of public authorities from establishing just and reasonable rates, that is, from at least January 1, 1917, to December 31, 1921, below an 8 per cent. return upon the reproduction value of the plaintiff's used and useful property, as of June 1, 1923, after taking into account additions thereto and withdrawals therefrom at actual cost, amounting to at least $1,947,733.29. The plaintiff offered further to prove that such deficiency below an 8 per cent. return upon the minimum investment in the plaintiff's property used and useful in the gas business, amounted, during such period, to at least $665,845.60. The plaintiff urged that it is entitled to have such deficiency added to the value of its property upon which it is entitled to a return, until such time as such deficiency shall have been amortized through earnings under rates making proper provision therefor. For reasons stated by me upon the trial, and upon the authority of the ruling in New York & Queens Gas Co. v. Prendergast (D. C.) 1 F. (2d) 351, I declined to receive such proof as relevant.

### Conclusions as to Value.

Taking all the above factors into consideration, that is to say, original cost to

plaintiff, investment, reproduction cost, cost of fixed capital as shown by books of account, including additions to October 31, 1924, and the capitalization of the company, as also Judge Sewell's findings in the state court action, I find, from all the evidence submitted and in the exercise of my best judgment, that the fair minimum value of plaintiff's property used and useful in the manufacture and distribution of gas was as follows:

As of June 1, 1923, not less than $4,750,000.00
As of December 31, 1923, not less than ...................... 4,785,000.00
As of October 31, 1924, not less than ...................... 5,233,869.00

That such amounts on such respective dates constitute the rate base on which the plaintiff is entitled to a fair and reasonable return.

### Operating Expenses.

The operating cost and taxes for the years ending December 31, 1922, December 31, 1923, and the nominal year ending November 30, 1924, were established by the plaintiff's witnesses and books of account and were not controverted by the defendants. The defendants, however, claim that certain items should be eliminated from these operating expenses, which I will now consider:

First. Salary paid to Mr. Davidson, the company's comptroller, it being urged by defendants that such services were of such questionable nature as not to inure to the benefit of the company's consumers; also that the company was not operated, in the opinion of the defendants, in the most economical manner in so far as relates to the size and number of the company's gas sets.

These two objections involve substantially the same question, namely: Did the management conduct its affairs with proper discretion and sound business judgment? In the absence of evidence to that effect, I assume that the management conducted its affairs discreetly and with the sound business judgment that the ordinarily prudent business man would exercise in the conduct of his own affairs.

In Consolidated Gas Co. v. Newton, Judge Learned Hand said: "As to the necessity of having 7 cars, I will rule here, as elsewhere, in the absence of some evidence showing that they were unnecessary, or that the officers abused their powers * * * that their judgment must stand prima facie. As in analogous situations, given the discretion, its exercise must be shown to have been injudicious * * * as in other cases where the matter rests in their discretion, I think that a presumption exists that it is well exercised until the contrary is shown." Consolidated Gas v. Newton (D. C.) 267 F. 255; State Pub. Utilities v. Springfield Gas, 291 Ill. 234, 125 N. E. 891; Southwestern Bell Telephone Co. v. P. S. C. Missouri, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807. Therefore, under the evidence, I have not eliminated from the costs of operation the salary paid to Mr. Davidson, or any portion of the costs of operation which may be asserted by some to have been paid by virtue of operating the enterprise in an alleged uneconomical manner.

The Public Service Commission has the power to order improvements in the property and operations of the plaintiff, if any feature of them be shown to be unreasonable, improper, inefficient, or unsafe. Mr. Welsh testified that the commission had not issued any order to the plaintiff other than the rate and standard orders which were placed in evidence before me. The men who are skilled in the operation of a gas company must be presumed to have done their best, conscientiously and effectively, until the contrary is shown by competent evidence. Items of actual outlay may not be eliminated by the court merely because one or both of the defendants wish to cut out something. A case of this sort does not call for minute paring of items protested but not attacked by proofs. This is particularly true as to items to which the defendant commission has raised no question in the course of its continuous supervision of the company's operations.

Second. The expenses of rate litigation ("regulatory commission expenses") have been apportioned by the plaintiff to the operating costs for 1923, and defendants assert that they should be eliminated in a confiscation suit. Judge Learned Hand, in Consolidated Gas v. Newton (D. C.) 267 F. 255, allowed these expenses and spread them. Judge Mayer, in N. Y. & Queens v. Newton (D. C.) 269 F. 290, while admitting that he should follow Judge Hand, did not allow them in a suit involving confiscation.

On the other hand, in the Brooklyn Borough Gas Co. Case, 17 N. Y. State Dept. Rep. 81, 113, Ex-Justice Hughes, sitting as a referee to hear and determine, allowed the rate case expenses and spread them over a period of years, and in the latest New York & Queens Gas Co. Case (D. C.) 1 F.(2d) 351, the master eliminated certain costs, such as

interest on unpaid taxes, federal income tax, and expenses of the rate case in the federal court, but allowed the expenses in the rate proceedings before the Public Service Commission, which he spread over a period of years.

While the special master's report in the last-mentioned case was confirmed by Judge Winslow upon final hearing, he expressed the view that "it may be debated as to whether some of these eliminations were proper," and, referring to the rate case expenses, that, "if it had been necessary, this court would have directed that the expense of such litigation be included in the year when incurred."

In Brooklyn Union Gas Co. v. Prendergast Case (D. C.) 7 F.(2d) 628, decided June 25, 1925, Judge Campbell, for the purposes of that suit, approved the special master's findings, which did not include in the operating expenses, for testing the constitutionality of the act, the rate case expense which was charged *in full* to the year's operations. I feel, however, that the item of rate case expenses in operating costs, *as spread by the plaintiff*, may properly be allowed.

Third. Uncollectible Bills.—The plaintiff includes as part of its cost of production and distribution the item of uncollectible bills, being the amounts of consumers' bills remaining due and unpaid, and according to the designation of the item presumably regarded by the plaintiff as uncollectible. This item in the year ending December 31, 1922, amounted to $4,984.56 or per M cubic feet .00788 cents; for year ending December 31, 1923, $5,896.63, or per M cubic feet .00849 cents and for the nominal year ending November 30, 1924, to $5,893.89, or per M cubic feet .8270 cents. I shall follow the practice established in this district in the other gas rate cases, and accordingly do not eliminate this item; no charge for interest on the uncollectible bills having been claimed.

Fourth. Miscellaneous General Expenses.—These expenses include the following items, all of which I allow in cost of operation: Expenses incurred in connection with issue of preferred stock, and with listing the plaintiffs' bonds on the New York Stock Exchange, services of trust company as trustee and as transfer agent; payment of $100 to regular Democratic organization of Richmond County for advertising and tickets to annual ball; cost of memberships in associations devoted to technical and commercial development of gas industry; directors' expenses when traveling in the interests of the plaintiff. The good management of the plaintiff having in my opinion been shown, I consider it a fair presumption that those disbursements were bona fide and legitimately made for the benefit of the plaintiff and its consumers.

Fifth. Insurance and Automobile Expenses.—The defendants claim that the expenses charged to operation and incurred for the payment of insurance premiums on liability and compensation insurance, as also the stable and garage expenses, should, as to at least 25 per cent. thereof, be charged to fixed capital, and that to that extent such items should be eliminated from the operating costs. This claim was asserted on the ground that, while at times 15 per cent. and at other times 25 per cent. of the cost of labor had been charged to construction account, it was not proper to charge 100 per cent. of cost of insurance covering labor and 100 per cent. of the stable and garage expenses to operating costs.

I am impressed with the justice of this contention, and in view of the evidence presented I disallow from "Costs of Production and Distribution" one-fifth of the amount of previous charge for liability and compensation insurance, and one-fifth of the amount of the stable and garage expenses included in the items respectively designated "Insurance" and "Stable and garage." Such elimination reduces the costs of production and distribution of gas produced at 550 and 537 B.t.u., exclusive of federal income tax, for the years 1922, 1923, and 1924, and on the rate base of $1 to private consumers, shows the following returns, after crediting miscellaneous revenue:

| Year. | Cost. | Return per M Cu. Ft. | |
|---|---|---|---|
| 1922 | $1.102090 | Deficit | $.10289 |
| 1923 | 1.015650 | Deficit | .01650 |
| 1924 | .938503 | Profit | .06063 |

On the basis of the $1 rate and 650 B. t. u. gas:

| Year. | Cost. | Return per M Cu. Ft. | |
|---|---|---|---|
| 1922 | $1.216490 | Deficit | $.21738 |
| 1923 | 1.087150 | Deficit | .08800 |
| 1924 | .992803 | Profit | .00633 |

The defendant Attorney General also urges the elimination of the real estate tax on that portion of premises of plaintiff at the corner of Post avenue and Clove road, which I have held was property not used and useful in the making of gas, and therefore not to be included in the rate base. I

am disposed to allow such claim, but no evidence was presented to enable me to find the amount of the tax to be so eliminated. The defendant Attorney General's counsel states in his brief that such tax amounts to $184, and, assuming that to be correct, the amount per 1,000 cubic feet of gas is insignificant, and it may be disregarded.

### Conclusions as to Operating Expenses and Net Revenues.

I find the actual, reasonable and necessary cost of the manufacture and distribution of the quality of gas supplied during the following periods, together with taxes and other operating expenses, and after deducting miscellaneous operating revenue, but exclusive of any return on property or investment, was as follows:

#### Year Ending December 31, 1922.
Gas Sold at 550 B. T. U. 632,599,200 Cu. Ft.

| | Per M Cu. Ft. Sold. |
|---|---|
| Cost of production | $0.68212 |
| Cost of distribution and other general expense | .33584 |
| Renewals and replacements | .03500 |
| Taxes, exclusive of federal income tax and interest on unpaid taxes | .06559 |
| Uncollectible bills | .00788 |
| Total operating cost | $1.12643 |
| Less miscellaneous operating revenue | .02434 |
| Net cost, exclusive of federal income tax, aside from any return on property | $1.10209 |
| Federal income tax actually charged | .01323 |
| Actual net cost, inclusive of federal income tax, aside from any return on property | $1.11532 |

#### Year Ending December 31, 1923.
Gas Sold at 537 B. T. U. 694,527,200 Cu. Ft.

| | Per M. Cu. Ft. Sold. |
|---|---|
| Cost of production | $0.60800 |
| Cost of distribution and general expenses | .32981 |
| Renewals and replacements | .03500 |
| Taxes (exclusive of federal income tax) | .06253 |
| Uncollectible bills | .00849 |
| Total operating cost | $1.04383 |
| Less miscellaneous operating revenue | .02819 |
| Actual net cost, exclusive of federal income tax, aside from any return on property | $1.01564 |
| Federal income tax actually charged | .02741 |
| Actual net cost, including federal income tax aside from any return on property | $1.04305 |

#### Twelve Months Ending November 30, 1924.
Gas Sold at 537 B. T. U. 712,671,000 Cu. Ft.

| | Per M. Cu. Ft. Sold. |
|---|---|
| Cost of production | $0.528307 |
| Cost of distribution and general expenses | .325899 |
| Retirement expense | .035000 |
| Taxes (exclusive of federal income tax) | .062024 |
| Uncollectible bills | .008270 |
| Total operating cost, exclusive of federal income tax | $0.959500 |
| Less miscellaneous operating revenue | .020997 |
| Net cost, exclusive of federal income tax | $0.938503 |
| Federal income tax actually charged | .041990 |
| Actual net cost inclusive of federal income tax, aside from any return on property | $0.980493 |

Accordingly, during the periods covered by the above statements, if the rate of $1 per M cubic feet of gas to private consumers had been effective, there would have been, during the years 1922 and 1923, an operating deficit, so that there would have been no return upon property or investment and no federal income tax payable, and for the year ending November 30, 1924, the net earnings would not have covered interest charges, and consequently no federal income tax would have been payable during that period. Under such rate the operating results, inclusive of any return upon the property or investment, at the $1 rate to private consumers, would have been as follows:

Year ending December 31, 1922, a *deficit* of $.10298 per M cubic feet.
Year ending December 31, 1923, a *deficit* of $.0165 per M cubic feet.
Nominal year ending November 30, 1924, an earning of $.060828 per M cubic feet.

During the last period the company operated, for substantially the entire time, its 11-foot generator set, claimed by the defendants as more economical than the operation of several of its smaller sets, and plaintiff was also enabled to purchase its generator fuel, boiler fuel, and gas oil at unit prices lower than in 1922 and 1923, per thousand cubic feet of gas made, viz.:

| | Generator Fuel. | Boiler Fuel. | Gas Oil. |
|---|---|---|---|
| 1922 | $.19807 | $.06136 | $.20737 |
| 1923 | .18736 | .05894 | .15217 |
| 1924 | .163991 | .050034 | .119243 |

The quantity of gas oil used during these three periods was substantially the same. Had plaintiff attempted the manufacture of 650 B.t.u., as required by chapter 899, Laws

of 1923, the net increase of cost of production of gas would have been:

|  | 1922. | 1923. | 1924. |
|---|---|---|---|
| Gas made | $.1028 | $.0685 | $.0481 |
| Gas sold | .1144 | .0715 | .0543 |

Had the $1 rate and 650 B.t.u. standard been applied to the plaintiff's net cost figures above stated, such net cost per thousand cubic feet would have amounted, in the year 1922, to $1.23; in the year 1923, to $1.12; during the 12 months of 1924, to $1.04—all of these figures being exclusive of any return upon property or investment.

I accordingly find that the provisions of chapters 898 and 899 of the Laws of 1923, in so far as they attempt to fix a rate to be charged by the plaintiff for gas, in the respective amounts of $1.20 and $1, are each confiscatory, and as such are in violation of the Constitution of the United States. I further find, from the evidence, that no margin of reasonable doubt exists between regulation and confiscation in the instant case, but that the effect of said statutes is so clearly shown to be confiscatory that it would be unreasonable to require the plaintiff to submit to further loss consequent on the requirement of a period of test under such statutes. New York & Queens Gas Co. v. Prendergast et al. (D. C.) 1 F.(2d) 351.

## The $1.20 Rate Left in Effect by Chapter 898 of the Laws of 1923.

Following the decision of the New York Supreme Court in the action instituted by this plaintiff against the Public Service Commission of the state of New York, which held the Dollar Rate Law to have been unconstitutional, as hereinbefore referred to, the Public Service Commission, by order entered August 30, 1922, in case No. 79–S, prescribed a calorific standard for gas to be furnished by this plaintiff and fixed its service charge at 2½ cents per meter per day, or 75 cents per month, which in conjunction with the commodity charge of $1.20 per M cubic feet of gas sold, was equivalent, in revenue producing effect, to a flat rate of approximately $1.45 per M cubic feet of gas sold. The Public Service Commission thereupon, pursuant to law, served upon this plaintiff a certified copy of its said order of August 30, 1922, so fixing the service and commodity charge and the calorific standard, such charges and standard to remain in effect from November 1, 1922, to and until October 30, 1923, and thereafter until said commission should otherwise order.

Accordingly this plaintiff, on or about September 15, 1922, duly notified the Public Service Commission in writing that the terms and conditions of the said order were accepted by it and would be obeyed. Contemporaneously with its order of August 30, 1922, the Public Service Commission made an order in its case No. 108, finding that the 22 candle power standard theretofore prescribed by statute was unreasonable, uneconomical, and improper, and that a standard based upon heating power of gas should be fixed, and that on and after October 1, 1922, this plaintiff and others should furnish gas having a total heating value on a monthly average of not less than 537 B. t. u. per cubic foot and a daily average of not less than 525 B. t. u. per cubic foot on any three consecutive calendar days in any month.

This order, which by its terms was to continue until changed, modified, or abrogated by the Commission, was thereafter duly served on plaintiff, which on or about September 15, 1922, duly notified the commission in writing that the terms and conditions of the said order in case No. 108 were accepted and would be obeyed by plaintiff. In compliance with said orders in cases Nos. 79–S and 108, the plaintiff duly filed with the commission and duly posted and published its tariff schedules.

It will accordingly be observed that, immediately prior to June 1, 1923, the plaintiff was duly authorized to make a fixed service charge, in addition to a fixed commodity charge, and to furnish and supply gas of a monthly average of not less than 537 B. t. u. for a definite period of time, which on June 1, 1923, had not expired. On June 1, 1923, the state Legislature, by chapter 898 of the Laws of 1923, assumed to abrogate such service charge, with the result that this plaintiff on June 1, 1923, was prohibited from making any service charge whatsoever, and was limited to a flat rate of $1.20 per M cubic feet of gas.

If chapter 898 had not, on June 2, 1923, been so closely followed by chapter 899, this plaintiff could have revised its rates, so as to include in its commodity rate the amount fixed by the commission as a service charge; but, as Judge Winslow says in the New York & Queens Gas Case, which involved the constitutionality of chapter 898: "The plaintiff, however, was precluded from increasing its commodity rates so as to make up the revenue which would otherwise be realized from the service charge, by chapter 899 of

the Laws of 1923, in effect June 2, 1923, limiting the maximum rate to a flat $1 per, M cubic feet. No opportunity whatever could be provided plaintiff for a revision of its rates." N. Y. & Queens Co. v. Prendergast (D. C.) 1 F.(2d) 351, 374.

Accordingly, for the period of one day chapter 898 limited the plaintiff to a commodity charge of $1.20 per M cubic feet, without the opportunity to revise and adjust its rates in reasonable conformity to its cost of operation. Judge Winslow in the N. Y. & Queens Case, supra, very properly states in his opinion: "At the outset, it may be conceded that confiscation of the property of the public utility takes place when the utility is limited to a rate which does not provide sufficient revenue to pay cost of production and distribution and, in addition, a reasonable return upon its investment. A rate which yields an amount less than operating expenses and taxes in effect consumes capital. The confiscatory feature is further present if the rate prevents a reasonable return upon the investment. * * * The court is of the opinion that both acts, in so far as they limit the rate, are confiscatory, and therefore in violation of the United States Constitution."

As is hereinbefore shown the operating cost and expense to the plaintiff in its production and distribution of gas per M cubic feet at the standard in effect at the time of the enactment of chapter 898 and during the brief period of its existence exclusive of any appreciable return on the investment was such that the rate of $1.20 per M cubic feet operated as a substantial confiscation of the plaintiff's property, and I accordingly find in the light of the evidence presented that chapter 898, Laws of 1923, is unconstitutional in so far as it affects this plaintiff.

#### Severability of Rate and Standard Provisions of Statute.

The consideration of chapter 899, Laws of 1923, involves two questions: (1) The confiscatory effect of the requirement limiting the rate for gas furnished or sold, to the sum of $1 per M cubic feet which has been disposed of; and (2) whether its provision limiting the rate and providing for a calorific standard of 650 B. t. u. are to be regarded and taken together as inseparable.

As to the latter question, the District Court for the Southern District of New York has found that they are inseparable, and I accordingly follow the ruling of Judge Winslow, who in his opinion in the Consolidated Gas Co. Case, 6 F.(2d) 243, handed down April 22, 1925, said: "This court is further of the opinion, as heretofore expressed in N. Y. & Queens Gas Co. v. Prendergast [1 F.(2d) 351] and Bronx Gas & Electric Co. v. Prendergast [1 F.(2d) 377], supra, that the rate and calorific standard prescribed by the statute under consideration are inseparable."

#### Binding Effect upon, or Estoppel of, Legislature of Orders of Public Service Commission.

I now proceed to the consideration of the effect of chapters 898 and 899 on the plaintiff's status in regard to the rates and gas standard theretofore fixed by the Public Service Commission, as hereinbefore mentioned. The plaintiff contended before me that the fixing of a rate and standard of gas for a specified period by order of the Public Service Commission, the acceptance thereof by the plaintiff, the posting and publishing of same, in compliance with law, the expenditure of considerable sums of money by plaintiff in adjusting its plant and property to comply with such standard, constituted a valid, subsisting obligation between the plaintiff and the state of New York, which the state and its instrumentalities were legally and morally estopped from repudiating, and the attempt to abrogate the same by the enactment of chapter 899 rendered such legislative act unconstitutional.

"It may be asserted that it is a well-established rule of law that a state may make a contract with an individual or with a corporation, and that such contract is entitled to the protection of the provisions of the United States Constitution as much as is a contract between individuals. It was long ago said by Chief Justice Marshall 'that a contract entered into between a state and an individual is as fully protected by the tenth section of the first article of the Constitution as a contract between two individuals.' * * * Providence Bank v. Billings, 4 Pet. 514, 560, 7 L. Ed. 939. * * * I am of opinion that the circumstances disclosed in this case, leading up to the making of the rate to take effect October 1, 1923, and to continue for a year, and its acceptance by the corporation, followed by the expenditure of considerable sums of money, constituted a valid contract for the period

mentioned. Mobile Gas. Co. v. Patterson (D. C.) 293 F. 208, at pages 219, 220. Its repudiation by the Legislature involves the impairment of the contract, which is properly the subject of judicial review. The court will not presume to comment upon the possible question of business integrity and honor. If the legislative body may deprive the plaintiff of its property without due process, or set at naught its contract, then all constitutional protection is gone for all persons." N. Y. & Queens Gas. Co. v. Prendergast (1924).

Judge Winslow, in the Consolidated Gas Case, stated in his opinion (April 22, 1925): "I have expressed my views also in those cases [N. Y. & Queens and Bronx Gas & Electric Co.] as to the contractual obligation resulting from the rate established by the Public Service Commission for the period of one year and until thereafter modified. I see no reason in the instant case for arriving at a different conclusion."

A contrary view of this question has, however, been taken by Judge Campbell, in the New York Eastern District Court, in the case of Brooklyn Union Gas Co. v. Prendergast, decided June 25, 1924, in which he said:

"A consideration of the authorities shows that the power of the legislature to authorize the making of a contract as to rates is limited. The regulation of rates to be charged by a public utility is an exercise of the police powers of the state (Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77), and contracts cannot be made which in any way impair or limit this power, nor can one Legislature limit or control a subsequent one in its exercise (B. E. S. R. Co. v. B. S. R. Co., 111 N. Y. 132, 19 N. E. 63, 2 L. R. A. 284; Manigault v. Springs, 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274). Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of the contract can extend to defeat the legitimate government authority. Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420.

"It has likewise been held that the Legislature, for the public welfare, may modify regulations regarding rates which municipalities may impose in granting licenses or permission to use its streets by public service corporations, without impairing the obligation of a contract within the provisions of the Constitution. People ex rel. Village

of South Glens Falls v. P. S. Comm., 225 N. Y. 216, 121 N. E. 777. It has also been held that neither the 'contract clause' nor the 'due process clause' of the federal Constitution has the effect of overriding the power of the state to establish all the regulations reasonably necessary to secure the health, safety, or general welfare of the community. Atlantic Coast Line v. Goldsboro, 232 U. S. 548, 34 S. Ct. 364, 58 L. Ed. 721."

Judge Campbell concluded: "I therefore hold that the statute in question does not violate section 10 of article 1 of the Constitution."

In view of the divergence of judicial opinion of the federal courts in the Eastern District of New York and the Southern District of New York, I have declined the plaintiff's request to make a finding that chapters 898 and 899 of the Laws of New York of 1923 are violative of the provisions of the Constitution of the United States, as impairing subsisting obligations of a contract entered into between the state of New York and this plaintiff establishing the service charge, gas rate, and the certain gas standard named in the orders of the Public Service Commission in its cases No. 79–S and 108; but I leave that question for any other or further disposition by the court upon final hearing.

### Rate of Return.

The fair return to which this plaintiff is constitutionally entitled is to be computed on the present value of its used and useful property, over and above all expenses of operation, including the cost of maintenance and taxes. Such return should be such as to yield net earnings sufficient to attract careful and conservative investors, and should be at least equal to the return ordinarily allowed in similar lines of business activity and investment.

The parties hereto have submitted a number of authorities in which the courts, in various parts of the country, have fixed rates varying considerably in amount. The state and federal courts, in the gas rate cases in this and the adjoining districts, have, however, held that a sufficient and proper rate of return on the property used in this class of enterprise is not less than 8 per cent. of the value of the property used and useful in the manufacture of gas, and I feel it only fit and proper that this company should be placed on a parity with such other companies to the extent of its rate of return.

I may add that the proofs in this case

fully confirm the fact, which is well within the common knowledge of residents of the borough of Richmond, as to the urgent need that this plaintiff gas company shall be permitted to earn at all times an adequate rate of return, to the end that it may be able to attract freely the substantial quantities of new capital which are necessary for its normal growth. The welfare of this company and of the communities which it serves are shown to have been seriously prejudiced, at times, by the inability of the company to charge rates yielding net earnings which induce ready contributions of new capital for additions to plant and extensions of mains and facilities. Curtailment of the company's earnings below an adequate return would be no boon to this Richmond territory.

For the purpose of this case, I fix 8 per cent. as a moderate and reasonable rate of annual return, if figured upon the present value of the plaintiff's property as hereinabove found. Whether a larger return should be allowed by the rate-making body, I express no opinion here.

## Conclusion.

I have carefully considered the testimony submitted to me in this case, as also the briefs of the parties, and, on the grounds stated in the foregoing report, it is my opinion that the plaintiff is entitled to judgment adjudging unconstitutional and void the provisions of chapters 898 and 899 of the Laws of 1923, and for the further relief recommended in the annexed findings of fact, all as is more particularly specified therein.

## Report of the Special Master.

To the Honorable Judges of the United States District Court for the Eastern District of New York:

I, the undersigned, the special master appointed by Hon. Marcus B. Campbell, District Judge, by an order entered October 11, 1923, directing such special master "to take the testimony and evidence upon the issues herein, make all needed computations and fully hear the facts, and to report to the court his findings of fact and conclusions of law, together with the evidence for the advisement of the court," do hereby respectfully report that, having been attended by counsel as below stated, I proceeded to take the proofs submitted and filed, together with a stipulation signed by the various solicitors waiving the signatures of the various witnesses to their several depositions and fur-

ther waiving the filing of the original exhibits marked in evidence.

There appeared before me the following:

For the plaintiff: Frank H. Innes, solicitor, by Frank H. Innes, William L. Ransom, and Jacob H. Goetz, of counsel.

For the defendants William A. Prendergast, William R. Pooley, Charles Van Voorhis, Oliver C. Semple, and George R. Van Namee (who was substituted in place of James A. Parsons), constituting the Public Service Commission of the state of New York: Charles G. Blakeslee, solicitor, by Melvin Krulewich, of counsel.

For the defendant Albert Ottinger (who was substituted in place of Carl Sherman), as Attorney General of the state of New York: John Holley Clark (who was substituted in place of James A. Donnelly), solicitor, by Harry Hertzoff, of counsel.

Upon the proofs as taken I find and report as follows:

1. The plaintiff, New York & Richmond Gas Company, was incorporated under and pursuant to the provisions of article 6 of the Transportation Corporations Law of the state of New York (Laws 1890, c. 566) by a certificate dated June 15, 1901, and filed June 17, 1901, in the office of the secretary of state of the state of New York, and in the office of the clerk of the county of Richmond, for the purpose, among other things, of manufacturing and supplying gas for public and private consumers in the borough of Richmond, county of Richmond, city and state of New York.

2. The Richmond County Gaslight Company was a gaslight corporation organized June 25, 1856, pursuant to an act of the Legislature of the state of New York passed February 16, 1848, entitled "An act to authorize the formation of gaslight companies." Laws 1848, c. 37. The Richmond County Gaslight Company built a coal gas plant and started supplying gas to its consumers in and about the year 1858.

3. The Consumers' Gaslight Company of Richmond County was a gaslight corporation, organized February 17, 1887, pursuant to the last above mentioned act of the Legislature of the state of New York, and thereafter acquired, possessed, and used certain property, consisting of mains and appurtenances and franchises.

4. The Staten Island Gaslight Company was a gaslight corporation organized June 25, 1884, pursuant to the last above mentioned act of the Legislature of the state of New York. Shortly after its organization,

it erected a manufacturing plant and installed a distribution system, and for a number· of years operated as a public utility. Pursuant to a judgment of foreclosure and sale, the property of the Staten Island Gaslight Company was sold to one Norman I. Rees, and by Rees conveyed to the Richmond County Gaslight Company by deed dated June 26, 1893.

5. On the 24th day of June, 1901, and theretofore, the Richmond County Gaslight Company owned and used certain lands, buildings, and other property, real and personal, for, and was actually engaged in, the manufacture, sale, and distribution of gas in the borough of Richmond, city of New York. In addition to such property, the Richmond County Gaslight Company owned, and was in the actual enjoyment of, franchises and rights to be a corporation and to exercise the privileges and rights of a corporation, to lay and maintain mains, pipes, and conductors in and under the streets, highways, alleys, lanes, and other public places in the territory then constituting the borough of Richmond, in the county of Richmond and the city of New York, for the purpose of supplying gas to the inhabitants of the said borough, and sundry other intangible rights. The Richmond County Gaslight Company had also developed the gas business in the said territory of the borough of Richmond, and had secured consumers sufficient in number and requirements to constitute a going and remunerative business.

6. On June 17, 1901, Forrest & Co., in behalf of the owners of practically all of the capital stock of the Richmond County Gaslight Company and all of the stock of the Consumers' Gaslight Company of Richmond County, offered to sell to the said New York & Richmond Gas Company 6,500 shares of the capital stock of said Richmond County Gaslight · Company, and all of the capital stock of the Consumers' Gaslight Company of Richmond County, to procure the satisfaction of the corporate mortgage of the said Richmond County Gaslight Company, and to relieve the property of said latter company from the lien of the bonds then issued and outstanding thereunder, to pay in cash for $100,000 par value capital stock of said New York & Richmond Gas Company, and to pay all expenses in connection with such acquisition and the merger or. consolidation of the Richmond County Gaslight Company and the Consumers' Gaslight Company of Richmond County with the vendee, in consideration of the delivery by the said New York & Richmond Gas Company of first mortgage bonds of said last-named company, of the amount of $1,000,000, and of the capital stock of said New York & Richmond Gas Company, of the par value of $1,450,-000, with the privilege of delivering the remaining 500 shares of the Richmond County Gaslight Company, and receiving therefor 500 shares of said New York & Richmond Gas Company. This offer was subsequently modified, so as to provide for the payment of cash to the amount of $1,000,000, instead of corporate bonds, with the option to the vendee to pay in corporate mortgage bonds instead of cash to that amount, and for the reduction of the number of shares of capital stock to be issued by 10 shares.

7. On June 19, 1901, the board of directors of the New York & Richmond Gas Company, after making inquiry to enable them to form a judgment of the value of the property, duly adopted a resolution that it was the judgment of the said directors that the properties to be acquired under the said proposal were necessary and desirable for the purposes of the business of the corporation, and that the value of the said property and services, over and above the $1,000,000 in cash to be given in part payment therefor, is at least equal to the face value of the 13,490 shares of the capital stock of the corporation proposed to be issued in consideration of the balance of the consideration for the said property and services.

8. Pursuant to the said offer and acceptance, an agreement was duly made and entered into, on the 21st day of June, 1901, by and between Forrest & Co., on the one part, and the New York & Richmond Gas Company, on the other part, embodying the terms of the said offer and acceptance, and thereafter such agreement was carried out and complied with.

9. Pursuant to the provisions of section 58 of the Stock Corporation Law of the state of New York, as the same then existed (Laws 1890, c. 564, § 58, as added by Laws 1896, c. 932), the said New York & Richmond Gas Company, then being the owner of all the capital stock of the said Consumers' Gaslight Company of Richmond County, by an instrument dated and executed June 24, 1901, and filed in the office of the secretary of state of the state of New York, July 1, 1901, merged the said Consumers' Gaslight Company of Richmond County with the said New York & Richmond Gas Company.

10. In order to carry into effect the plan of the said transaction, and pursuant to the provisions of the Business Corporations Law of the state of New York, constituting chapter 41 of the General Laws of the state of New York, as then existing, by an agreement in writing dated June 24, 1901, and filed in the office of the secretary of state of the state of New York on July 13, 1901, and in the office of the clerk of the county of Richmond on the same day, the said Richmond County Gaslight Company and the said New York & Richmond Gas Company consolidated with the consent of the directors and stockholders of each of said corporations, which said consolidated corporation so formed was known as "New York & Richmond Gas Company," for the period of fifty years.

11. The said New York & Richmond Gas Company, so formed by said consolidation agreement, is the plaintiff corporation in this action.

12. The plaintiff, by virtue of the purchase of the capital stock and the merger with it, of the Richmond County Gaslight Company, acquired all of the property and succeeded to the rights, privileges, and franchises of the said Richmond County Gaslight Company, and has been continuously furnishing gas under said franchises from 1901 to the present time.

13. The principal office and place of business of the plaintiff is located at Stapleton, in the Second ward of the borough of Richmond, city and state of New York, and the plaintiff is, and since the time of its incorporation as aforesaid has been, engaged in manufacturing and distributing gas for light, heat, and power, in the First, Second, Third, and Fourth wards of the borough of Richmond, within which territory it has, maintains, and operates a system of mains, pipes and conductors in the public streets, highways, and places.

14. In pursuance of the said agreement of June 21, 1901, there was issued by the plaintiff to the vendors $1,450,000 par value of its capital stock, $50,000 par value of such stock being reserved to exchange for $25,000 par value of capital stock of the Richmond County Gaslight Company, and thereafter the last-mentioned stock was acquired by the plaintiff, which issued therefor the $50,000 par value of the capital stock of the plaintiff. There is now issued and outstanding capital stock of the plaintiff of the par value of $1,500,000, and such stock has been dealt in by the public since its issue, and until at least the year 1916.

Bonds of the par value of $1,000,000 were issued in part payment for the plant, property, franchises, stock, and effects so acquired by it, and $500,000 of the said bonds were issued from time to time, the proceeds of the sale of which were used for improvements and betterments of the plant and property of the plaintiff. All of said bonds were dealt in by the public, and were generally distributed among numerous holders, until they were discharged or refunded.

By an order made by the Public Service Commission of the state of New York, for the First district, on or about April 23, 1921, the said commission authorized the issuance by the plaintiff of $1,956,000 of bonds, including $1,500,000 of such bonds for discharging or refunding the principal of the bonds of the plaintiff to the aggregate amount of $1,500,000, which had been issued by it as aforesaid, and which had matured on May 1, 1921.

15. The defendants William A. Prendergast, William R. Pooley, Charles Van Voorhis, Oliver C. Semple, and George R. Van Namee, or the successor in office of any of them, whose term may have expired since the commencement of this action, constitute the Public Service Commission of the state of New York, and are now acting as such commission, having been duly appointed under and by virtue of the provisions of chapter 480 of the Laws of 1910 of the state of New York, known as chapter 48 of the Consolidated Laws of the state of New York, as amended and supplemented by several acts, including chapter 134 of the Laws of 1921, prescribing their powers and providing for the regulation of certain public service corporations, including the plaintiff. The defendants are citizens of, and reside in, the state of New York, and at least one of the defendants at the time of the commencement of this action resided in the borough of Brooklyn, city of New York, in the Eastern district of New York.

George R. Van Namee, as public service commissioner of the state of New York, was substituted as such defendant in the place and stead of James A. Parsons, named as an original defendant in this action, by an order dated January 9, 1925, and made and entered in this action.

16. The defendant Albert Ottinger, as Attorney General of the state of New York, is a citizen of the state of New York, and

resides in the city of New York and state of New York, and was substituted as defendant in this action in place and stead of Carl Sherman, as Attorney General of the state of New York, named as an original defendant in this action, by the said order dated January 9, 1925.

17. Prior to and since June 1, 1923, the plaintiff has been the owner and in the possession of a parcel of land at Clifton, in the borough and county of Richmond, located upon the northerly side of Willow avenue and the westerly side of Bay street, having a frontage of approximately 539 feet on Willow avenue, 92 feet on Bay street, and abutting on the right of way of the Staten Island Rapid Transit Railway Company for a distance of approximately 727 feet.

18. Prior to and since June 1, 1923, the plaintiff has been the owner and in possession of another parcel of land at Clifton, on the southerly side of Willow avenue, having a frontage of approximately 150 feet, and a depth of about 145 feet.

19. Prior to and since June 1, 1923, the plaintiff has been also the owner and in the possession of another parcel of land, located at West New Brighton, in the borough and county of Richmond, city and state of New York, at the southwest corner of Post avenue and Clove road, and having a frontage of approximately 118 feet on Clove road, and 490 feet on Post avenue.

20. Upon the parcel of land on the northerly side of Willow avenue (excepting for part of the time the westerly portion thereof acquired by the plaintiff in 1922), the plaintiff since July 15, 1901, has owned and used, and still owns and uses, a plant for the manufacture and distribution of carbureted water gas. Additions and improvements have been made to the said plant and property so acquired, and renewals and replacements have have been made from time to time.

As of June 1, 1923, the plaintiff's gas manufacturing plant, exclusive of the extensions in progress, consisted primarily of four modern Lowe type water gas generator sets, one set being 6 feet in diameter, two sets being 7 feet 6 inches in diameter, and one set being 9 feet in diameter, which provided a total rated generating capacity of 4,500,000 cubic feet of gas per day, and a normal working and dependable capacity for the entire plant of 2,500,000 cubic feet of gas per day.

Subsequent to June 1, 1923, in order to meet the reasonable requirements of its consumers, plaintiff has made various additions, extensions and improvements in its plant, including the erection of an additional water gas generator set, 11 feet in diameter, and accessory equipment, increasing the total rated generating capacity to 8,000,000 cubic feet of gas per day, and the normal working and dependable capacity for the entire plant to 3,500,000 cubic feet of gas per day.

21. Upon the said parcel of land, the plaintiff owned and used as of June 1, 1923, and since then has owned and used various buildings constructed of brick and other permanent material, and owns, has, and uses, various other machinery, boilers, and other apparatus and appliances.

22. Upon the parcel of land on the northerly side of Willow avenue, the plaintiff owned and used as of June 1, 1923, a storage gas holder in a steel tank having a capacity of 1,000,000 cubic feet, and also a 100,000 cubic foot capacity relief holder.

Upon the parcel of land on the southerly side of Willow avenue, the plaintiff owned and used as of June 1, 1923, a storage holder in a brick tank, having a capacity of 200,000 cubic feet, which has since been converted into a relief holder.

Upon the parcel of land at the corner of Clove road and Post avenue, the plaintiff owned and used as of June 1, 1923, a storage gas holder in a brick tank, having a capacity of about 180,000 cubic feet of gas.

Subsequently to June 1, 1923, the plaintiff acquired a parcel of land located at Washington and Van Name and Simonson avenues, Mariners' Harbor, Staten Island, upon which the plaintiff has erected and now uses a gas storage holder of 1,000,000 cubic foot gas capacity.

23. As of June 1, 1923, and prior thereto, plaintiff also necessarily kept, under lease, and used in the conduct of its business, an office and show room at 691 Bay street, Stapleton, in the borough and county of Richmond, for the use and accommodation of its general office, bookkeeping staff, and commercial department, and a display room for the exhibition and sale of domestic industrial gas appliances. Subsequent to June 1, 1923, the plaintiff acquired the said office building and land upon which the same is located.

24. The plaintiff owned and used, as of June 1, 1923, in the First, Second, Third and Fourth wards of the borough of Richmond, mains and services of various sizes as follows:

Mains.

| Size. Low Pressure: | Quantity of Mains, Feet. |
|---|---|
| 16-inch cast iron | 9,306 |
| 12-inch cast iron | 21,346 |
| 10-inch cast iron | 17,700 |
| 8-inch cast iron | 50,047 |
| 6-inch cast iron | 130,712 |
| 4-inch cast iron | 276,470 |
| 3-inch cast iron | 72,783 |
| 4-inch steel | 13,647 |
| 3-inch steel | 2,640 |
| 2½-inch steel | 1,321 |
| 2-inch steel | 118,284 |
| 1½-inch steel | 15,252 |
| 1¼-inch steel | 15,611 |
| 1-inch steel | 3,427 |
| ¾-inch steel | 425 |

| High Pressure: | |
|---|---|
| 12-inch cast iron | 26,800 |
| 6-inch steel | 32,142 |
| 4-inch steel | 1,850 |
| 2-inch steel | 33,735 |

Services.

| Size. | Number. |
|---|---|
| 4-inch | 4 |
| 2-inch | 359 |
| 1½-inch | 572 |
| 1¼-inch | 8,650 |
| 1-inch | 5,908 |

25. As of June 1, 1923, the plaintiff had outstanding $1,500,000, par value, of common capital stock, consisting of 15,000 shares, par value, of $100 each, and $2,125,-000, par value, of 6 per cent. first mortgage lien bonds; it also had other invested resources consisting of current obligations of $201,501.19 and surplus and reserves of $405,775.49, or a total investment in its gas business of $4,232,276.68.

As of December 31, 1922, the outstanding capitalization and other invested resources of the gas business of the plaintiff consisted of $1,500,000, par value, of common capital stock, $2,125,000, par value, of 6 per cent. first mortgage lien bonds, $272,141.79 of current obligations, and $350,806.38 of surplus and reserves, or a total of $4,247,948.17.

As of December 31, 1923, the outstanding capitalization and other invested resources of the gas business of the plaintiff consisted of $1,500,000, par value, of common capital stock, $2,125,000, par value, of first mortgage lien bonds, $120,000, par value, of 7 per cent. preferred capital stock, $370,122.66 of current obligations, and $351,589.91 of surplus and reserves, or a total of $4,466,712.57.

As of July 31, 1924, the outstanding capitalization and other invested resources of the plaintiff consisted of $1,500,000 of common capital stock, $2,125,000 of 6 per cent. first mortgage lien bonds, $25,000 of purchase-money mortgage, $334,400, par value, of 7

per cent. preferred capital stock, $416,780.35 of current obligations, and $424,402.87 of surplus and reserves, or a total of $4,825,-583.22.

26. Subsequently to January 1, 1909, the books of account of the plaintiff company, as well as of all other gas companies in the city of New York, have been required to be kept in accordance with the rules and regulations of the defendant Public Service Commission of the state of New York, or its predecessor the Public Service Commission for the First district, which commissions have had certain jurisdiction over said companies pursuant to the provisions of the Public Service Commission Law (formerly the Public Service Commissions Law) of the state of New York, and I find that the books, accounts, and records of the plaintiff company have been kept in conformity with such rules and regulations so prescribed by authority of the state of New York; that such books, accounts, and records have been kept under the continuing supervision of the duly authorized representatives of the Legislature of the state of New York; and that such books, accounts and records accurately set forth the receipts, outlays and other facts therein undertaken to be shown.

27. By subdivision 5 of section 66 of chapter 480 of the Laws of 1910, as supplemented and amended by several acts, including chapter 134 of the Laws of 1921, known as the "Public Service Commission Law," it is provided that, whenever the said commission shall be of opinion, after a hearing had upon its own motion or upon complaint, that the rates, charges, or classifications or the acts or regulations of any gas corporation, the definition of which includes the plaintiff, are unjust, unreasonable, unjustly discriminatory, or unduly preferential or in any wise in violation of any provision of law, the said commission shall determine and prescribe, in the manner provided by and subject to the provisions of section 72 of the said chapter, the just and reasonable rates, charges, and classifications thereafter to be in force for the service to be furnished, notwithstanding that a higher or lower rate or charge has theretofore been prescribed by general or special statute, contract, grant, franchise condition, consent, or other agreement, and the just and reasonable acts and regulations to be done and observed.

28. By subdivision 3 of section 66 of the said chapter, as so supplemented and amended, it is provided that the said commission shall have power by order to fix and

change, from time to time, standards of the purity, illuminating power, and heating power, and standards for the measurement thereof, of gas to be manufactured, distributed, or sold by persons, corporations, or municipalities for lighting, heating, or power purposes, notwithstanding that other standards of the purity, illuminating power, and heating power of gas and standards for the measurement thereof may have been fixed by general or special statute, and by order to require the gas so manufactured, distributed or sold to equal the standards so fixed by it, and to prescribe, from time to time, the reasonable minimum and maximum pressure at which gas shall be delivered by such persons, corporations, or municipalities.

29. By section 72 of the said chapter, as so supplemented and amended, relating to complaints as to the quality and price of gas, it is provided that, after a hearing and after such an investigation as shall have been made by the said commission or its officers, agents, examiners, or inspectors, the said commission may, by order, fix just and reasonable prices, rates, and charges for gas to be charged by a gas corporation, for the service to be furnished, notwithstanding that a higher or lower price has been theretofore prescribed by general or special statute, contract, grant, franchise condition, consent, or other agreement, and may order such improvement in the manufacture, distribution, or supply of gas, or in the methods employed by a gas corporation, as will in its judgment be adequate, just, and reasonable, and that any such change in price shall be upon such terms, conditions, or safeguards as the said commission may prescribe. By section 72 of the said chapter, it is further provided that the price fixed by the said commission under the said section 72, or under the said subdivision 5 of section 66, shall be the maximum price to be charged by such gas corporation for gas for the service to be furnished within the territory and for a period to be fixed by the said commission in the order, not exceeding three years, except in the case of a sliding scale, and thereafter until the commission shall, upon its own motion or upon complaint of any corporation, person, or municipality interested, fix a higher or lower maximum price of gas to be thereafter charged.

30. By subdivision 1 of section 23 of the said chapter, as so supplemented and amended, it is provided that, within a time specified in the order of the commission, every person and corporation upon whom it is served must, if so required in the order, notify the commission whether the terms of the order are accepted and will be obeyed, and that every order of a commission shall take effect at a time therein specified, and shall continue in force either for a period which may be designated therein, or until changed or abrogated by the commission, unless such order be unauthorized by the said chapter or any other act or be in violation of a provision of the Constitution of the state or of the United States.

31. Prior to the amendment of said chapter 480 of the Laws of 1910 by chapter 134 of the Laws of 1921, the plaintiff was advised by counsel and believed that, under the construction placed by the courts of the state of New York upon the said chapter 480 of the Laws of 1910, before it was so amended, the Public Service Commission of the state of New York for the First district, as then constituted, had no power to permit the plaintiff to increase the rate which it might charge for gas supplied, in excess of the maximum rate of $1 per 1,000 cubic feet prescribed by chapter 125 of the Laws of 1906 of the state of New York.

32. On or about the 27th day of January, 1920, the plaintiff commenced an action in the Supreme Court of the state of New York, in and for the county of Richmond, against Lewis Nixon, as and constituting the Public Service Commission of the state of New York, for the First district, Charles D. Newton, as Attorney General of the state of New York, and Joseph Maloy, as district attorney of the county of Richmond, wherein and whereby the plaintiff sought to have chapter 125 of the Laws of the state of New York, passed in the year 1906, in so far as it prohibited the plaintiff from charging or receiving for gas manufactured or sold by it in the borough of Richmond, a sum per 1,000 cubic feet in excess of $1 per 1,000 cubic feet, declared illegal and void, because in contravention of section 10, art. 1, of, and of the Fourteenth Amendment to, the Constitution of the United States, and of section 6, art. 1, of the Constitution of the state of New York; and the plaintiff further prayed that it be granted a permanent injunction against the defendants and each of them restraining and enjoining them and each of them from enforcing or attempting to enforce the provisions of said act of 1906 against the plaintiff, and for other and further relief as in said complaint is more fully set forth.

33. Thereafter and on or about May 21, 1920, the Supreme Court of the state of New York, at the Appellate Division thereof for

the Second Department, by order, allowed the city of New York to intervene as a party defendant therein.

34. The defendants named in the said complaint in the action mentioned in the finding numbered 32 hereof were duly served with the summons therein, and duly appeared and respectively filed answers in the said action. Thereafter, and on May 26, 1920, the said cause was duly referred to Hon. Albert H. Sewell, official referee, to hear, try, and determine the same and all the issues therein. The issues in the said action were duly tried before the said referee, and the proofs and allegations of the respective parties duly heard and considered, and thereafter such proceedings were had and taken in the said cause that the said referee duly made his findings of fact and conclusions of law dated January 10, 1921, wherein and whereby the said referee found, among other things, that the total reasonable cost of gas delivered to its consumers by the plaintiff in cents per 1,000 cubic feet of gas sold was, aside from any return upon any of the property owned by the plaintiff and used by it in the service of its consumers, 92.82 cents during the year 1918, 97.559 cents during the year 1919, 95.894 cents during the first seven months of the year 1920, and $1.22365 for the month of August, 1920, and wherein and whereby the said referee further found that the amount invested in the plant and property of the plaintiff, used and useful in its gas business as of January 1, 1920, was at least the sum of $2,560,000, and wherein and whereby the said referee further found that the plant, machinery and equipment used in the gas business of the plaintiff had been and then were maintained in excellent operating condition, proper repairs, renewals, and replacements had been made as and when needed, and the same were then in as high a state of efficiency as if new; that the reasonable and proper rate of return upon the capital invested in the plant, distributing system, and other properties owned by the plaintiff and used and useful in its gas business was not less than 8 per cent. per annum, and that the requirements of chapter 125 of the Laws of 1906, as amended, as to the candle power of the gas manufactured and sold by the plaintiff, under its operating conditions, and by the use of the materials it was and had been able to procure with reasonable diligence, were and for two years last past had been unreasonable, confiscatory, impossible of performance, and invalid, and wherein and whereby the said referee found, as a conclusion of

10 F.(2d)—13

law, that chapter 125 of the Laws of 1906 of the state of New York, as amended by chapter 604 of the Laws of 1916, in so far as it provided that the plaintiff should not charge or receive for gas manufactured, furnished, or sold by it a sum per 1,000 cubic feet in excess of a rate of $1, had been since January, 1918, and then was, confiscatory and deprived the plaintiff of its property without due process of law, in violation of the Constitution of the state of New York, and of the Fourteenth Amendment of the Constitution of the United States, and that the plaintiff should have the other and further relief against the defendants in that suit which was asked for in the complaint therein.

35. Thereafter, and on the 11th day of January, 1921, a judgment, final in its character, was duly made and entered upon the said findings of fact and conclusions of law of said referee, which adjudged that chapter 125 of the Laws of 1906 of the state of New York, in so far as it prohibited the plaintiff from charging or receiving more than the rate of $1 per 1,000 cubic feet for the sale of gas in the borough of Richmond, had been since January 1, 1918, and then was, confiscatory, and deprived the plaintiff of its property without due process of law, in contravention of the Constitution of the state of New York, and of the Fourteenth Amendment to the Constitution of the United States, and that said statute had been since January 1, 1918, and then was, invalid, as violative of said provisions of the Constitution of the state of New York and of the United States, and adjudged and decreed that the plaintiff was entitled to the relief prayed for, and granted the permanent injunction prayed for in the said complaint.

In and by the said judgment, it was further adjudged and decreed that, at any time while the injunction thereinbefore granted remained in force, any party thereto, or his or its successors or assigns, might apply, upon notice, at the foot thereof, to vacate or modify the injunction, if it could be shown that by changed conditions the statutory rate was no longer confiscatory in effect under such new conditions.

36. Thereafter an appeal from the said final judgment was duly taken by the said defendants to the Appellate Division of the Supreme Court of the state of New York, in and for the Second Judicial Department; and on October 6, 1922, the said Appellate Division duly dismissed the appeals of all of the said defendants, except the appeal of the defendant the city of New York, and

thereafter and on November 10, 1922, the said Appellate Division dismissed the appeal of the defendant the city of New York. Thereafter the said defendant the city of New York made application to the Court of Appeals of the state of New York, for leave to appeal to that court, and on February 2, 1923, the said Court of Appeals denied the said application to appeal, and the said judgment so entered in said action on January 11, 1921, became and is in all things absolute.

37. On or about the 20th day of May, 1921, the said commission, upon its own motion, duly instituted a proceeding before it for the purpose of investigating the rates charged by the various gas corporations in the city of New York, including the plaintiff, and their operating expenses, revenues, service, properties, and investment, and made an order for a hearing to be held before it in its case No. 79 for that purpose. Thereafter such proceedings were had that on or about the 30th day of August, 1922, the said commission rendered and filed an opinion, and certain reports supplementary thereto, setting forth its findings and conclusions, and the reasons for the making and entry of orders, prescribing a calorific standard for gas to be furnished and the rates for such gas to be charged by certain gas corporations, including the plaintiff. Thereupon, and contemporaneously with the making and entry of an order prescribing a calorific standard for gas as hereinafter more fully described, the said commission made and entered an order in its case No. 79–S wherein and whereby the said commission ordered that on and after the 1st day of November, 1922, and until the 30th day of October, 1923, and thereafter until the said commission should otherwise order, the just and reasonable rates to be charged by the plaintiff to all of its consumers in the city of New York, other than the city of New York, and the classifications of the service furnished to such consumers, should be as follows:

First 100,000 cubic feet of gas per meter per month, $1.20 per M cu. ft.
Next 200,000 cubic feet of gas per meter per month, $1.15 per M cu. ft.
Next 300,000 cubic feet of gas per meter per month, $1.10 per M cu. ft.
Next 400,000 cubic feet of gas per meter per month, $1.05 per M cu. ft.
All over 1,000,000 cubic feet of gas per meter per month, $1.00 per M cu. ft.
Plus a monthly service charge of seventy-five cents (75¢), or two and one-half cents (2½¢) a day.

The service charge of 2½ cents per day, as prescribed by the commission, was substantially equivalent to about 25 cents per 1,000 cubic feet of gas sold by the plaintiff.

38. Thereafter the said commission, pursuant to the provisions of the said order and the authority vested in the commission by subdivision 1 of section 23 of the Public Service Commission Law as amended, caused a certified copy of the said order of August 30, 1922, to be duly served upon the plaintiff, and on or about the 15th day of September, 1922, the plaintiff duly notified the said commission in writing that the terms and conditions of the said order were accepted by the plaintiff and would be obeyed. The notification of acceptance, sent by the plaintiff to the said commission as above stated, read and provided as follows:

"The New York & Richmond Gas Company hereby acknowledges receipt on September 5, 1922, of a copy of an order certified by the secretary of the commission to have been adopted by the commission on August 30, 1922, in the above-entitled proceeding, prescribing the rates to be charged for gas by the said company to all of its customers, except the municipality of the city of New York, and the classifications of the gas service furnished to such customers. The New York & Richmond Gas Company hereby notifies the commission that the said order of August 30, 1922, and the terms and conditions thereof, are accepted by the company, and will be obeyed.

"In accepting, and agreeing to obey, the said order of August 30, 1922, conditioned for the period therein prescribed, the New York & Richmond Gas Company does not waive its right, upon any hearings or proceedings hereafter had, to a return upon the full value of its property at such time, and to reimbursement for losses sustained by it since January 1, 1917, by reason of inadequate statutory rates enforced against it; nor does the company admit that the rates prescribed by the said order are adequate or that they are such as to afford for this company just compensation for the gas service furnished by it, or a fair return upon its investment in its gas property, much less upon the present value thereof. This company excepts to the recital in the said order of August 30, 1922, of the report made and filed herein by Hon. B. Meredith Langstaff, assistant counsel, a copy of which has at no time been furnished to this company, and as to the contents of which this company was never afforded an opportunity to be heard, and this company reserves all exceptions to

any and all statements contained in the said report.

"Increases in the cost of operation, particularly those due to the high prices necessarily paid for coal and coke, justify an increase rather than a decrease of the rates now charged by this company. In deference, however, to the views of the commission, reached after extended investigation, and in an expectation or hope that, as intimated by the commission in its opinion in the Case of the Consolidated Gas Company decided concurrently with this case, some reductions in operating expenses during the period fixed by the commission for the continuance of the rates now prescribed may render such rates more nearly adequate, the New York & Richmond Gas Company has determined to, and does hereby, accept the said order of August 30, 1922, upon the terms and conditions herein set forth."

39. On or about the 20th day of May, 1921, contemporaneously and in conjunction with its said proceedings as to rates in case No. 79, the said commission duly instituted a proceeding before it, upon its own motion, in its case No. 108, relative to the standards of purity, lighting power, and heating power of gas and the standards of measurement thereof, in the city of New York and suburban territory. Such proceedings were had in the said last-mentioned proceeding that on or about the 30th day of August, 1922, contemporaneously with its said rate order in case No. 79–S, the said commission made and entered an order in its case No. 108, wherein and whereby the commission found and determined that the standard of 22 candle power theretofore prescribed by statute was unreasonable, uneconomical, and improper; that the continuance of such standard would not be in the public interest, and that a standard of quality and measurement based upon the heating power of gas, as thereinafter more particularly specified, should be fixed by the commission, and wherein and whereby the said commission directed that on and after October 21, 1922, each gas corporation supplying manufactured gas in the boroughs of Manhattan, Brooklyn, the Bronx, Queens, and Richmond, comprising the city of New York, and in the franchise territory of the Queens Borough Gas & Electric Company, in the county of Nassau, should, in lieu of the existing standard or standards, furnish to its consumers a quality of gas which should comply with certain requirements therein prescribed including a requirement that, under specified conditions, the gas furnished should have a total heating value on a monthly average of not less than 537 British thermal units per cubic foot, and a daily average of not less than 525 British thermal units per cubic foot on any three consecutive calendar days in any month, all as more fully set forth in the said order, and wherein and whereby it was further directed that the said order should take effect on the date specified therein, and should continue in effect until changed, modified or abrogated by the said commission, and that, within ten days of the service of a copy thereof, each gas corporation therein described, including the plaintiff, should notify the said commission whether the said order was accepted and would be obeyed.

40. Thereafter, the said commission caused a certified copy of the said order in its case No. 108, of August 30, 1922, to be duly served upon the plaintiff; and on or about the 15th day of September, 1922, the plaintiff duly notified the said commission in writing that the terms and conditions of the said order in case No. 108 were accepted and would be obeyed by the plaintiff. The plaintiff's acceptance of the said order of the commission in case No. 79–S was based and conditioned on the contemporaneous entry of the order in case No. 108 and the continuance of the calorific standard thereby fixed.

41. Thereafter, and in pursuance of the said orders of the commission in cases Nos. 79–S and 108, the plaintiff duly filed with the said Commission, and duly posted and published as required by law and order of the said commission, its tariff schedules, setting forth the rates, charges, and classifications to be in force for the service to be furnished by the plaintiff, in accordance with the said orders of the said commission in its case No. 79–S and case No. 108, of August 30, 1922, and the plaintiff has complied in all respects with the terms, provisions, and conditions of the said order in case No. 79–S and of the said order in case No. 108.

42. The rates charged by the plaintiff to its general consumers, from January 1, 1922, to October 31, 1922, were $1.25 per 1,000 cubic feet of gas furnished, with a service charge of 75 cents per meter per month, or 2½ cents per day; from November 1, 1923, to June 8, 1923, the rates prescribed by the said order of the commission of August 30, 1922; and since June 8, 1923, the plaintiff has charged, in pursuance of the preliminary injunction herein granted, an equivalent flat rate of $1.45 per 1,000 cubic feet of gas, with certain gradations for quantity consumption. The rate charged by the plaintiff to the city of New York was 75 cents per 1,000 cubic feet, in accordance with

the provisions of chapter 736 of the Laws of 1905 of the state of New York.

Since October 1, 1922, the gas operations of the plaintiff have been carried on under the calorific 'standard of measurement of quality, as prescribed by the said order of August 30, 1922 and prior to that date the plaintiff had also been observing a calorific standard of measurement of the quality of gas made by it. The average calorific content of the gas supplied by the plaintiff during the year 1922 was approximately 550 British thermal units per cubic foot, and the average during each of the years 1923 and 1924 was slightly above 537 British thermal units per cubic foot.

43. By chapter 899 of the Laws of 1923 of the state of New York, entitled "An act to amend the Public Service Commission Law, in relation to the charge for illuminating gas in cities containing a population of one million or over," the said chapter 480 of the Laws of 1910 was amended, by inserting therein a new section, to follow section 67, to be section 67-a, to reads as follows:

"§ 67-a. *Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum."

By the said chapter 899 of the Laws of 1923 it is provided that the said act shall take effect immediately, and the said act took effect, by the signing thereof by the Governor of the state of New York, on June 2, 1923.

44. The city of New York, within which the plaintiff is engaged in the business of manufacturing, furnishing and selling illuminating gas, is a city containing a population of 1,000,000 or over, and is the only city of such size and population within the state of New York. The Constitution of the state of New York, in its classification of the cities of the state, does not state or recognize a classification of cities under which one class is made up of cities containing a population of 1,000,000 or over.

45. By chapter 898 of the Laws of 1923 of the state of New York, entitled "An act to amend the Public Service Commission Law, in relation to charges by gas corporations," the said chapter 480 of the Laws of 1910 was amended, by adding thereto a new subdivision, to follow subdivision 5, to be subdivision 6 of said section, to read as follows:

"6. *Service Charges Prohibited.* Every gas corporation shall charge for gas supplied a fair and reasonable price. No such corporation shall make or impose an additional charge or fee for service or for the installation of apparatus or the use of apparatus installed."

By the said act it is provided that the same shall take effect immediately, and the said act took effect, by the signing thereof by the Governor of the state of New York, on June 1, 1923.

46. Under the Public Service Commission Law as amended by chapter 899 of the Laws of 1923, the commission has not the power or jurisdiction to prescribe, authorize, allow, or fix, for the plaintiff or other gas companies in the city of New York, a rate in excess of $1 per 1,000 cubic feet for gas of not less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure.

47. In the present suit, the periods covered by the proofs before me as to operating revenues and expenses of the plaintiff's gas business included the calendar year of 1922, the calendar year of 1923, and the 12 months' period ended November 30, 1924. The proofs presented by the plaintiff also covered the investment in the plaintiff's gas property as of the years 1922, 1923, and 1924, and the reproduction cost and present value of such property.

48. I find that the plaintiff necessarily and reasonably used, on the average, in the manufacture of gas of the quality supplied during the year 1922, 2.883 gallons of gas oil per 1,000 cubic feet of gas made. During the year 1923, the plaintiff necessarily and reasonably used, on the average, 2.865 gallons of gas oil per 1,000 cubic feet of gas made, and during the year ended November 30, 1924, 2.85 gallons per 1,000 cubic feet, in the manufacture of gas of the respective qualities supplied during those periods.

49. For the manufacture of gas of a delivered content of not less than 650 British thermal units per cubic foot, as prescribed by chapter 899 of the Laws of 1923, there would be required not less than 4.7 gallons under average conditions, and at least 5 gallons per 1,000 cubic feet during certain times of the year.

50. The reasonable and necessary average cost of oil used by the plaintiff during the year 1922 was 7.19 cents per gallon, during the year 1923 was 5.31 cents per gallon, and during the year ended November 30, 1924, was 4.18 cents per gallon.

51. The plaintiff necessarily and reasonably used in its generators, in the manufacture of gas during the year 1922, 36.239 pounds of anthracite broken coal and coke per 1,000 cubic feet of gas made. During the year 1923 the plaintiff reasonably used 36.541 pounds of anthracite broken coal and coke per 1,000 cubic feet of gas made. The necessary amount of such generator fuel used during the year ended November 30, 1924, was 35.98 pounds per 1,000 cubic feet of gas made.

52. The average cost to the plaintiff of anthracite generator coal used by it during the year 1922 was $11.3122 per gross ton delivered at the plaintiff's plant. Such cost during the year 1923 was $11.6724 per gross ton, and during the year ended November 30, 1924, was $11.515 per gross ton. The average cost to the plaintiff of coke used by it during the year 1922 was $16.0995 per gross ton delivered at the plaintiff's plant and such cost during the year 1923 was $10.5402 per gross ton, and during the year ended November 30, 1924, was $9.4703 per gross ton.

53. The plaintiff also necessarily and reasonably used under the boilers, in the manufacture of gas during the year 1922, 18.115 pounds of fuel consisting of bituminous and anthracite steam coal, screenings from the anthracite generator coal, and coke breeze. During the year 1923 such boiler fuel necessarily and reasonably used by the plaintiff amounted to 18.144 pounds per 1,000 cubic feet of gas made, and during the year ended November 30, 1924, to 13.49 pounds per 1,000 cubic feet of gas made together with the electric energy purchased to run the blowing equipment.

54. In the manufacture of water gas there is also required the use of iron mass, city water, and incidental minor materials and supplies. The cost of these items in the plaintiff's plant amounted in 1922 to 1.527 cents per 1,000 cubic feet of gas made, in the year 1923 to 1.85 cents per 1,000 cubic feet of gas made, and in the year ended November 30, 1924, to 1.349 cents per 1,000 cubic feet of gas made.

55. In the manufacture of water gas under the conditions obtaining in a plant such as that of the plaintiff, there is realized as a residual credit under average operations, water gas tar equal in amount to from about 10 to 11 per cent. of the gas oil used. During the year 1922 there was realized 201,078 gallons of water gas tar for which production expense was credited at the rate of 3.62 cents per gallon. During the year 1923 there was realized 227,808 gallons of water gas tar for which production expense was credited at the rate of 3.81 cents per gallon, and during the year ended November 30, 1924, there was realized 255,866 gallons of water gas tar for which production expense was credited at the rate of 5.07 cents per gallon.

56. There is also realized from the manufacture and distribution of gas, in the plaintiff's works and system, a residual credit for drip oil reasonably amounting to approximately 1.3 per cent. of the gas oil used. Such drip oil, during the years 1922, 1923, and 1924, as sold by the plaintiff, was credited to the cost of production.

57. In the manufacture of water gas of the calorific content of not less than 650 British thermal units per cubic foot, as prescribed by chapter 899 of the Laws of 1923, under the conditions obtaining in a plant such as that of the plaintiff, there would be required for generator fuel, per 1,000 cubic feet of gas made, approximately 35.5 pounds of the grade being supplied in recent years, or its fuel equivalent, and for boiler fuel per 1,000 cubic feet of gas made, approximately 17.6 pounds of solid fuel, or its fuel equivalent in water gas tar, and there would be realized, as residual credit under average operations, water gas tar amounting to .752 gallons per 1,000 cubic feet of gas made.

58. There is also necessary in the manufacture of water gas, in a plant such as that of the plaintiff, the employment of gas-making labor and repair labor, the use of repair material, and the incurring of miscellaneous works expense and gas storage. During the year 1922, under the prices and rates of pay then in force the cost of gas-making labor in the plaintiff's plant was 8.149 cents, of repair labor and material 4.804 cents, and of miscellaneous works expense and gas storage 1.333 cents, per 1,000 cubic feet of gas made. During the year 1923, under the prices and rates of pay then in force, the cost of gas-making labor was 8.548 cents, of repair labor and material 4.256 cents, and of miscellaneous works expense and gas storage 1.275 cents, per 1,000 cubic feet of gas made. During the year ended November 30, 1924, the cost of such items was, for gas-making labor 7.5812 cents, for repair labor and material 4.9886 cents, and for miscellaneous works expense and gas storage 1.3617 cents, per 1,000 cubic feet of gas made.

59. During the year 1922 under the prices of material and labor at that time in force, the reasonable and actual cost of the water gas manufactured in the plaintiff's plant for the use of its consumers was 61.257 cents per 1,000 cubic feet of gas made. During the year 1923 such cost was 54.261 cents per 1,000 cubic feet of gas made, and during the year ended November 30, 1924, was 46.7438 cents per 1,000 cubic feet of gas made.

60. In the manufacture and sale of gas, a percentage of the gas made is necessarily and unavoidably lost, due to condensation, difference in temperature at the consumers' meters, slow meters, stolen gas, leakage, and the like. The relative amount of gas lost varies according to the sales of gas in relation to the mileage and size of mains, the character of the soil in which the mains are laid, and various other factors. I find that the unaccounted-for gas, as to the plaintiff, represented in 1922 approximately 9.91 per cent., in 1923 approximately 10.42 per cent., and in the year ended November 30, 1924, approximately 11.09 per cent., and that in calculating the plaintiff's present requirements and costs these approximate figures should be used as a basis of computation.

61. During the year 1922 the plaintiff sold to its consumers 632,599,200 cubic feet of gas, and during the year 1923, 694,527,200 cubic feet of gas. During the year ended November 30, 1924, such gas sales amounted to 712,671,000 cubic feet. The consumption of gas and its sale varies from time to time, depending, in large part, upon the weather and consequent factors. The "peak" or maximum demand in the territory served by the plaintiff is found in the winter months. The plaintiff company must therefore be prepared not alone to make sufficient gas to meet a total annual demand, but must be prepared to meet such maximum day's demand as may develop, and the maximum day in any year may exceed the maximum day of any previous year. The increased use of gas as a substitute for coal for heating and other domestic uses has a tendency to accentuate the maximum day's demand in relation to the annual output, and thus requires a relatively large plant capacity in relation to the average daily requirements. I find that the plaintiff's plant ought reasonably to have, in addition to a reasonable reserve manufacturing capacity of the plant as a whole, a reserve generating capacity equal to the capacity of its largest generating unit (3,500,000 cubic feet per day) as accidents or the need for repairs may at any time take this unit out of use, and the plant must therefore have sufficient capacity to meet a possibly increased maximum day's demand, if it occurred at a time when this largest generating unit was not being operated.

62. The actual and reasonable cost of manufacture of gas supplied by the plaintiff to its consumers during the year 1923 was 68.212 cents per 1,000 cubic feet of gas sold. Such cost during the year 1923 was 60.8 cents per 1,000 cubic feet of gas sold, and during the year ended November 30, 1924, was 52.8307 cents per 1,000 cubic feet of gas sold.

63. I find that the reasonable and necessary amount of taxes actually paid or accrued by the plaintiff on the property owned and used by it for the production and distribution of gas and upon its gas operations was, during the year 1922, 7.882 cents per 1,000 cubic feet of gas sold; during the year 1923, 8.994 cents per 1,000 cubic feet of gas sold, and during the year ended November 30, 1924, 10.4014 cents per 1,000 cubic feet of gas sold. The foregoing figures of taxes actually and reasonably paid by the plaintiff include the amount actually paid or accrued by the plaintiff for federal income taxes upon its gas operations, under the rates actually charged by it, of 1.323 cents per 1,000 cubic feet of gas sold during 1922, of 2.741 cents per 1,000 cubic feet of gas sold during 1923, and of 4.199 cents per 1,000 cubic feet of gas sold during the year ended November 30, 1924.

If, however, the $1 rate prescribed by chapter 899 of the Laws of 1923 had been in force during the full period of the proofs herein, the plaintiff would have paid no federal income tax upon 1922 operations, and would not pay any federal income tax upon 1923 or 1924 operations, for the reason that, as hereinafter found, no net income would have been earned under such $1 rate during 1922 and 1923, and the deductions from the income during 1924 would have left no income subject to that tax. With the amount of federal income tax eliminated from the plaintiff's operations, the amount of other taxes actually paid by the plaintiff would be reduced to 6.559 cents per 1,000 cubic feet sold in 1922, to 6.253 cents per 1,000 cubic feet sold in 1923, and to 6.2024 cents per 1,000 cubic feet sold in the nominal year ending November 30, 1924.

64. There should be included in the total cost of making and distributing gas the cost of renewals and replacements of property owned by the plaintiff, and from the evidence before me in this case I find the sum

of 3½ cents per 1,000 cubic feet of gas sold charged by the plaintiff for such retirement expense, based upon its experience over a period of years, to be reasonable and necessary for such purpose.

65. In addition to the items hereinbefore referred to, there must be included, in determining the cost of gas delivered to the consumer, various items entering into the cost of distribution, including transmission and distribution expense, commercial expense, general and miscellaneous expense, and uncollectible gas bills, and I further find that the actual and reasonable cost to the plaintiff of these several items, in cents per 1,000 cubic feet of gas sold, during the year 1922 was 34.372 cents, during the year 1923, 33.830 cents, and during the year ended November 30, 1924, 33.4169 cents.

66. On the evidence before me I find that the total actual and reasonable cost of gas delivered to its consumers by the plaintiff, in cents per 1,000 cubic feet of gas sold, before giving effect to miscellaneous operating revenue, during the period covered by the proof submitted before me, was and is as follows, aside from any return upon any of the property owned and used by the plaintiff in the service of its consumers:

|  | Year 1922. | Year 1923. | 12 Months 11/30/24. |
|---|---|---|---|
| Cost of production ........ | $ .68212 | $ .60800 | $ .528307 |
| Cost of distribution, etc..... | .34372 · | .33830 | .334169 |
| Taxes ........ | .07882 | .08994 | .104014 |
| Renewals and replacements.. | .03500 | .03500 | .035000 |
| Total ..... | $1.13966 | $1.07124 | $1.001490 |

If the $1 rate for gas had been in effect during the years 1922, 1923 and 1924, there would have been no net earnings and therefore no federal income tax payable or paid during 1922 and 1923, and there would have been no taxable income, after allowing for deductions, during the year 1924. In the foregoing statement of the plaintiff's actual operating expenses under the rates actually charged, I have not deducted this item of federal income taxes, amounting to 1.323 cents per 1,000 cubic feet of gas sold for the year 1922, and 2.741 cents per 1,000 cubic feet of gas sold for the year 1923, and 4.199 cents per 1,000 cubic feet of gas sold for the nominal year ended November 30, 1924.

67. The plaintiff derives an income from its profits on the sale of appliances, which is classified as miscellaneous operating revenue, and also from the moneys received as rental for a portion of its general office building, and of which the plaintiff gives its consumers the benefit by crediting the sum against the cost of manufacturing and distributing gas. During the year 1922 such miscellaneous operating revenue reasonably amounted to 2.434 cents per 1,000 cubic feet of gas sold, during the year 1923, to 2.819 cents per 1,000 cubic feet of gas sold, and during the year ended November 30, 1924, to 2.0997 cents per 1,000 cubic feet of gas sold.

68. I find that the net actual necessary and reasonable cost to the plaintiff of the gas supplied by it, after deducting miscellaneous operating revenue, during the year 1922 was $1.11532, during the year 1923 was $1.04305, and during the year ended November 30, 1924, was $.980493, exclusive of any return whatever upon the property or investment of the plaintiff necessarily devoted to the service of its consumers. The evidence adduced in this record affords no ground for expecting that the prices of material and wages paid for labor will, on the whole, be reduced from the wages and prices now being paid by the plaintiff.

69. I find that the manufacture and distribution by the plaintiff of gas of a thermal content of not less than 650 British thermal units, during the year 1922, would have cost at least 10.28 cents per 1,000 cubic feet of gas made, or equivalent to 11.44 cents per 1,000 cubic feet of gas sold, more than the cost of production and distribution of the gas actually made and supplied during that year by the plaintiff; during the year 1923, would have cost at least 6.85 cents per 1,000 cubic feet of gas made, or equivalent to 7.15 cents per 1,000 cubic feet of gas sold more than the cost of production and distribution of the gas actually made and supplied during that period by the plaintiff, and during the year ended November 30, 1924, would have cost at least 4.81 cents per 1,000 cubic feet of gas made, or equivalent to 5.43 cents per 1,000 cubic feet of gas sold, more than the cost of production and distribution of the gas actually made and supplied during that year by the plaintiff.

70. I find that the fair and reasonable market value of the land (unimproved) owned by the plaintiff and used and useful in its gas business on the northerly side of Willow avenue, between Bay street and Tompkins avenue, as of June 1, 1923, and as of the present time, was and is at least the sum of $135,000.

71. I find that the fair and reasonable market value of the land (unimproved) owned by the plaintiff and used and useful in its gas business on the south side of Willow avenue, between Bay street and Tompkins

avenue, as of June 1, 1923, and as of the present time, was and is at least the sum of $7,400.

72. I find that of the land owned by the plaintiff at the corner of Post avenue and Clove road, a part only was used and useful, June 1, 1923, in the gas business, and that such part was the portion on which plaintiff's gas holder is erected, and which is distant about 332 feet from the southwesterly corner of Post avenue and Clove road, with a frontage on Post avenue of about 158 feet. I further find that the fair and reasonable market value of said portion of land, unimproved, is the sum of $7,600.

73. I find the cost to make plaintiff's property as new amounts to $18,281.91 which should be deducted from reproduction cost, and I further find that the cost to reproduce the manufacturing plant, distributing system, and other tangible property owned by the plaintiff and used and useful in its gas business, as of June 1, 1923, based upon the unit prices of labor and material prevailing as of that time, exclusive of working capital and going value, was and is, with the deduction for cost to make as new amounting to $18,281.91, at least the sum of $4,245,021.42, made up as follows:

| | |
|---|---:|
| Land | $ 150,000.00 |
| Buildings | 197,836.55 |
| Mains and services | 2,354,152.78 |
| Plant and holders | 604,300.00 |
| Meters | 225,000.00 |
| Tools and equipment | 32,014.00 |
| | $3,563,303.33 |
| Less cost to make new | 18,281.91 |
| | $3,545,021.42 |
| Undistributed costs | 700,000.00 |
| | $4,245,021.42 |

74. The plaintiff submitted proofs before me of its average working capital actually employed in its gas business, amounting during the year 1922, to $343,496.63, during the year 1923, to $347,384.23, and during the nominal year ended July 31, 1924, $384,405.34, and the testimony of expert witnesses that the amount reasonably necessary was $344,146. I find that the reasonable and necessary working capital of the plaintiff in its gas business as of June 1, 1923, and as of the present time, was and is at least the sum of $275,000.

75. The plaintiff also submitted proofs before me of the amount of going value possessed by the plaintiff in its gas business, as of June 1, 1923, and as of the time of the trial, such evidence having been given by witnesses called in behalf of the plaintiff, based

upon methods of computation of such going value. No testimony was presented by any witness called in behalf of the defendants as to the amount or method of computation of the going value of the plaintiff, as of June 1, 1923, or the present time. I find that the reasonable and necessary going value of the plaintiff in its gas business, as of June 1, 1923, and of the present time, was and is at least the sum of $644,000.

76. I find that the cost to reproduce the manufacturing plant, distributing system and other tangible property owned by the plaintiff, used and useful in its gas business, as of June 1, 1923, inclusive of working capital and going value, was as of June 1, 1923, at least the sum of $5,164,021.42, made up as follows:

Reproduction cost of property owned by New York & Richmond Gas Company and used and useful in its gas business as of June 1, 1923:

| | |
|---|---:|
| Reproduction cost of tangible property as of June 1, 1923 | $4,245,021.42 |
| Investment in working capital reasonably required as of June 1, 1923 | 275,000.00 |
| Investment in going value, as of June 1, 1923 | 644,000.00 |
| Total | $5,164,021.42 |

77. From all the facts appearing before me, I find that the present value of the plaintiff's property used and useful in its gas business, as of June 1, 1923, was $4,750,000. I find, further, that the plaintiff's property used and useful in its gas business, and the present value of such property, has been increased and added to, since June 1, 1923, by the net cost of the various additions, improvements, and extensions thereto which have been made since June 1, 1923, as hereinafter more particularly shown.

78. I find that the actual reasonable cost of additions, extensions and improvements in and to the plaintiff's manufacturing plant, distributing system, and other tangible property, which should be added to the present value of the plaintiff's property as of June 1, 1923, amounted to $54,183.52 during the period from June 1, 1923, to December 31, 1923, and to $481,552.90 during the period from January 1, 1924, to October 31, 1924. The withdrawals from the property of the plaintiff used in its gas business, at unit prices prevailing as of June 1, 1923, amounted to $19,971.06 for the period from June 1, 1923, to December 31, 1923, and to $32,683.11 for the period from January 1, 1924, to October 31, 1924, making a net increase applicable to the present value of the plaintiff's used and useful property of $34,212.46 during the

period from June 1, 1923, to December 31, 1923, and of $448,869.79 during the period from January 1, 1924, to October 31, 1924.

79. From all the facts appearing before me, I therefore find that the present value of the property owned by the plaintiff, and used and useful in its gas business, as of December 31, 1923, was the sum of $5,198,233.-88, and as of October 31, 1924, the sum of $5,647,103.67, including working capital and going value and additions as hereinbefore found. I further find that the minimum fair value of the property owned by the plaintiff, used and useful in its gas business and constituting a rate base on which plaintiff is entitled to a fair return was as follows:

As of June 1, 1923.............$4,750.000.00
As of December 31, 1923........ 4,785.000.00
As of October 31, 1924 ......... 5,233.869.00

80. I find that the cost to the plaintiff of all the fixed capital acquired by it, as shown by its books of account as of January 1, 1920, was $3,393,720.89. The like cost to the plaintiff of the plant and property acquired by it amounted, on July 15, 1901, to $2,337,234.24. Since July 15, 1901, there have been erected, installed, or acquired by the plaintiff, and added to its property, and there were in use in its gas business on January 1, 1920, certain additional land, plant, apparatus, mains and other property of which the actual cost to the plaintiff, less withdrawals since July 15, 1901, and exclusive of working capital, was and is not less than $1,056,486.65, making the total book cost to the plaintiff of such property owned and used by it as of January 1, 1920, at least the sum of $3,393,720.89.

Since January 1, 1920, the net additions to the fixed capital of the plaintiff (including expenditures charged to work in progress account) amounted, as of December 31, 1922, to $279,763.97; as of June 1, 1923, to $345,-962.41; as of December 31, 1923, to $555,-692.66; and as of October 31, 1924, to $900,-089.44. A credit adjustment was made, in 1921, in the account of fixed capital installed after December 31, 1908, amounting to $132. I find, therefore, that the cost to the plaintiff of all of its fixed capital acquired by it, as shown by its books of account, as of December 31, 1922, was $3,673,352.86; as of June 1, 1923, was $3,739,551.30; as of December 31, 1923, was $3,949,281.55; and as of October 31, 1924, was $4,293,678.33. I also find that the cost to the plaintiff of all of the fixed capital acquired by it, as shown by its books of account, together with working capital, which I have found in the amount of $275,000, and going value which I have

found in the amount of $644,000, was as of December 31, 1922, $4,592,352.86; as of June 1, 1923, $4,658,551.30; as of December 31, 1923, $4,868,281.55; and as of October 31, 1924, $5,212,678.33.

81. The minimum investment in the plaintiff's property used and useful in its gas business, as found by the court in the prior action of the plaintiff in the Supreme Court of the State of New York, Richmond County, to wit, New York & Richmond Gas Company v. Public Service Commission et al., as of January 1, 1920, was $2,560,000. The net additions made to the plaintiff's property from January 1, 1920, to December 31, 1922, were as follows:

January 1, 1920, to December 31,
1920 ..........................$30,767.93
January 1, 1921, to December 31,
1921 ..........................$30,555.56
January 1, 1922, to December 31,
1922 ..........................$84,996.70

The work in progress on additions to the plaintiff's property amounted, as of December 31, 1922, to $133,443.78. I therefore find that the minimum investment in the plaintiff's said property, upon the basis of the court's findings in the prior action, together with the net additions to the property, was, as of December 31, 1922, at least the sum of $2,839,763.97.

The net additions to the plaintiff's property from January 1, 1923, to June 1, 1923, amounted to $7,481.66, and the work in progress on additions to the plaintiff's property amounted as of June 1, 1923, to $192,-160.56. I therefore find that the minimum investment in the plaintiff's said property, upon the basis above stated, was, as of June 1, 1923, at least the sum of $2,905,962.41.

The net additions to the plaintiff's property from January 1, 1923, to December 31, 1923, amounted to $125,762.26, and the work in progress on additions to the plaintiff's property amounted, as of December 31, 1923, to $283,610.21. I therefore find that the minimum investment in the plaintiff's said property, upon the basis above stated, was, as of December 31, 1923, at least the sum of $3,115,692.66.

The net additions to the plaintiff's property from January 1, 1924, to October 31, 1924, amounted to $22,740.22, and the work in progress on additions to plaintiff's property amounted as of October 31, 1924, to $605,266.77. I therefore find that the minimum investment in the plaintiff's said property, upon the basis above stated, was, as of October 31, 1924, at least the sum of $3,460,-089.44.

82. The plant, machinery, and equipment used in the gas business of the plaintiff company have been and are maintained in excellent operating condition; proper repairs, renewals, and replacements have been made as and when needed, and the same are now in as high a state of efficiency as if new, except in so far as certain buildings have been temporarily affected by the extensions in progress since June 1, 1923.

83. The reasonable and proper rate of return upon the present value of the plant, distributing system, and other properties owned by the plaintiff, and used and useful in its gas business, I find to be not less than 8 per cent. per annum. At no time since the enactment of chapter 899 of the Laws of 1923 has the plaintiff earned such return at the rate, prescribed therein, of $1 per 1,000 cubic feet of gas sold, either upon the amount of the present value of its property or upon the amount of the minimum investment in such property.

84. The effect of the enforcement of the rate of $1 per 1,000 cubic feet of gas sold, prescribed by chapter 899 of the Laws of 1923, if applied to the actual operations of the plaintiff's gas business for the year ended December 31, 1922, aside from the additional cost necessary to furnish gas of the statutory standard of 650 British thermal units, would have been to impose upon it a direct operating loss of at least $65,144.35, or 10.298 cents per 1,000 cubic feet of gas sold, in addition to depriving it of any return upon the property owned by it employed in its gas business, as more fully set forth as follows:

| | Amount. | Per M Cu. Ft. of Gas Sold. |
|---|---|---|
| Cost of production | $431,506.52 | $ .68212 |
| Cost of distribution | 217,452.84 | .34372 |
| Taxes (exclusive of federal income tax) | 41,493.89 | .06559 |
| Renewals and replacements | 22,141.77 | .03500 |
| Total operating expenses | $712,577.02 | $1.12643 |
| Less miscellaneous operating revenue | 15,395.67 | .02434 |
| Net operating expenses | $697,181.35 | $1.10209 |
| Gross operating revenues from sales of gas at statutory rates: | | |
| Commercial sales, 630,350,400 cu. ft. at $1.00. | $630,350.40 | $1.00000 |
| Municipal sales, 2,248,800 cu. ft. at 75 cents | 1,686.00 | .75000 |
| Total sales | $632,037.00 | $ .99911 |
| Operating loss | $ 65,144.35 | $ .10298 |

In reaching and stating the foregoing figures as to the effect of an enforcement of the $1 rate for gas, I have eliminated the amounts paid for federal income taxes, and also the portion of insurance and stable and garage expense which I have allocated as chargeable to capital. If such $1 rate had been in force, no federal income tax would have been payable upon the plaintiff's gas operations during the periods stated. The above-indicated operating loss, inclusive of the sum of 11.44 cents, per 1,000 cubic feet of gas sold, as the additional cost of furnishing gas of the standard of 650 minimum British thermal units as prescribed by chapter 899 of the Laws of 1923, would have amounted to 21.738 cents per 1,000 cubic feet of gas sold, or approximately $137,000, exclusive of federal income tax, and exclusive, also, of any return whatever on the plaintiff's property, used in its gas business.

85. During the year ended December 31, 1923, the statutory rate of $1 per 1,000 cubic feet of gas to private consumers, if applied to the actual operations, aside from the additional cost necessary to furnish gas of the statutory standard of 650 British thermal units, would have deprived the plaintiff of any return upon its property used and useful in its gas business, and have resulted in a direct operating loss of $11,460.41, or more than 1.5 cents per 1,000 cubic feet of gas sold, as follows:

| | Amount. | Per M Cu. Ft. of Gas Sold. |
|---|---|---|
| Cost of production | $422,274.72 | $ .60800 |
| Cost of distribution | 234,953.20 | .33830 |
| Taxes (exclusive of federal income tax) | 43,435.68 | .06253 |
| Renewals and replacements | 24,308.45 | .03500 |
| Total operating expenses | $724,972.05 | $1.04383 |
| Less miscellaneous operating revenue | 19,578.07 | .02819 |
| Net operating expenses | $705,393.98 | $1.01564 |
| Gross revenues from sales of gas at statutory rates: | | |
| Commercial sales, 692,152,700. cu. ft. at $1.00. | $692,152.70 | $1.00000 |
| Municipal sales, 2,374,500 cu. ft. at .75. | 1,780.87 | .75000 |
| Total sales, 694,527,200 cu. ft. | $693,933.57 | $ .99914 |
| Operating loss | $ 11,460.41 | $ .01650 |

The foregoing figures are also exclusive of federal income tax and the portion of insurance and stable and garage expense, which I have allocated as chargeable to capital.

Such operating loss, inclusive of the additional cost of furnishing gas of a standard of not less than 650 minimum British thermal units, would have been approximately .088 cents per 1,000 cubic feet of gas sold, or more than $61,000, exclusive of federal income taxes, for reasons hereinbefore stated, and exclusive, also, of any return upon the property of the plaintiff used and useful in its gas business.

86. During the year ended November 30, 1924, the statutory rate of $1 per 1,000 cubic feet of gas to private consumers, if applied to the actual operations of the plaintiff, aside from the additional cost necessary to furnish gas of the statutory standard of 650 British thermal units, would have resulted as follows:

| | Amount. | Per M Cu. Ft. of Gas Sold. |
|---|---|---|
| Cost of production | $376,510.01 | $ .528307 |
| Cost of distribution | 238,146.17 | .334168 |
| Taxes (exclusive of federal income tax) | 44,202.78 | .062024 |
| Renewals and replacements | 24,943.47 | .035000 |
| Total operating expenses | $683,802.43 | $ .959500 |
| Less miscellaneous operating revenue | 14,964.09 | .020997 |
| Net operating expenses | $668,838.34 | $ .938503 |
| Gross operating revenue from sales of gas at statutory rates: | | |
| Commercial sales, 710,195,700 cu. ft. at $1.00 | $710,195.70 | $1.000000 |
| Municipal sales, 2,475,300 cu. ft. at $.75 | 1,856.47 | .750000 |
| Total sales | $712,052.17 | $ .999130 |
| Net income | $ 43,213.83 | $ .060628 |

The above-stated net income, exclusive of any provision for federal income taxes, which must, however, be included in the operating expenses, and of the portion of insurance and stable and garage expense, which I have allocated as chargeable to capital, would have yielded a return upon the property of the plaintiff used and useful in its gas business as of June 1, 1923, of but .91 per cent. on the present value, and of but 1.49 per cent. on the minimum investment as found by the court in the prior suit of this plaintiff, and as found by me on the evidence herein, plus net additions to June 1, 1923.

Inclusive of, the sum of 5.43 cents per 1,000 cubic feet of gas sold as the additional cost of furnishing gas of the standard of 650 minimum British thermal units, as prescribed by chapter 899 of the Laws of 1923,

the effect of such enforcement would have been to yield a net income from operations of about $4,500, or .6328 cents per 1,000 cubic feet of gas sold, yielding practically no return upon the property owned by the plaintiff and employed in its gas business.

87. The enforcement of chapter 898 of the Laws of 1923, eliminating the service charge of 75 cents per meter per month from the rates prescribed by the commission's order of August 30, 1922, and prohibiting that portion of the rate for gas charged by the plaintiff in excess of the maximum rate of $1.20 per 1,000 cubic feet, authorized by the commission, would have resulted as follows, if applied to the operations of the year ended December 31, 1923:

| | Amount. | Per M Cu. Ft. of Gas Sold. |
|---|---|---|
| Gross revenue from sales of gas: | | |
| Commercial sales, 692,152,700 cu. ft. at $1.20 per M. cu. ft. | $830,583.24 | $1.20 |
| Municipal sales, 2,374,500 cu. ft. at .75 per M. cu. ft. | 1,780.87 | .75 |
| Total sales, 694,527,200 cu. ft. | $832,364.11 | $1.1985 |
| Net operating expenses (exclusive of federal income taxes) | 705,393.98 | 1.01564 |
| Net income under $1.20 rate | $126,970.13 | $ .18286 |

Exclusive of any provision for federal income taxes (which must, however, be included in the operating expenses, in computing the rate to which the plaintiff is legally entitled), and of the portion of insurance and stable and garage expense which I have allocated as chargeable to capital, the above-stated net income would have yielded a return upon the property of the plaintiff, used and useful in its gas business as of June 1, 1923, of but 2.67 per cent. upon the present value, and but 4.37 per cent. upon the minimum investment, as found by the court in the prior suit of this plaintiff, plus net additions to June 1, 1923, as found by me, and a return of 2.65 per cent. upon the present value as of December 31, 1923, and of 4.07 per cent. upon the minimum investment as of December 31, 1923, and such amounts of return each would have been, and are, inadequate, unreasonably low, confiscatory of the plaintiff's property, and violative of the constitutional rights of the plaintiff.

88. The provisions of chapter 899 of the Laws of 1923, prohibiting the plaintiff from furnishing, in the city of New York, gas of

a standard less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure, in conjunction with the provisions thereof prohibiting the plaintiff from charging a rate for gas per 1,000 cubic feet in excess of $1, requires the plaintiff to furnish gas of the standard prescribed, at a rate therefor which does not afford reasonable compensation for the service rendered and a reasonable return upon the fair value of the property used and useful in rendering such service.

89. The provisions of chapter 899 of the Laws of 1923 were specified and required by its terms to be and become effective immediately upon the signing of the measure by the Governor of the state of New York, and required the plaintiff forthwith to comply with the provisions thereof in respect to the thermal content of the gas delivered to consumers. In order that gas of the thermal content prescribed by the said provision of chapter 899 of the Laws of 1923 might be furnished to the plaintiff's consumers under conditions assuring the safety of such supply, it would be necessary, before the plaintiff undertook to furnish gas conforming to such a standard, to have all the various gas appliances used by the plaintiff's consumers changed and readjusted so as to adapt them to the use of gas conforming to such standard. Such appliances in use by the plaintiff's consumers number at least 20,000. It would have been physically impossible to change and readjust the gas appliances used by the plaintiff's consumers in order to adapt them to the safe use of gas of such standard forthwith, and such work would necessarily have occupied a period of several months, and, if the plaintiff had attempted to comply with the requirements of the said provision and to furnish gas of such standard before such changes were made, the supplying of such gas would probably have resulted in injury to life and property. Such changes in the adjustment of gas appliances to adapt them to the use of gas of the standard prescribed by the said chapter 899 would impose upon the plaintiff the expenditure of a substantial sum of money and the use of gas of the standard prescribed by the said chapter 899 would, in many cases, require the purchase by consumers, and the substitution of new appliances, which would cost such consumers substantial sums of money. The plaintiff was and is entitled to a reasonable opportunity, to make or to have its consumers make such adjustment of or

changes in the gas appliances as were necessary to adapt them to the consumption of gas of the standard prescribed by chapter 899 of the Laws of 1923, and in so far as the provisions of the said chapter 899 of the Laws of 1923 did not afford the plaintiff such an opportunity, the said statute was and is violative of the constitutional rights of the plaintiff to enjoy and use its property and manage and conduct its business. The plaintiff was entitled to a safe and adequate judicial review of the legality of chapter 899 of the Laws of 1923, both in respect to the provisions relating to the rates fixed therein and in respect of the standard of gas prescribed thereby, and the plaintiff was and is entitled to have the operation and enforcement of the provision of chapter 899 of the Laws of 1923 in so far as it prohibits the plaintiff from furnishing gas of a standard other than that prescribed therein judicially enjoined pending such a judicial review and until a reasonable opportunity had been afforded to it to comply with the requirements of said statute. Chapter 899 of the Laws of 1923, requiring the plaintiff forthwith upon the taking effect of the statute to furnish gas of a minimum of 650 British thermal units, was and is an unlawful and unconstitutional exercise of legislative power, in the further respect that an immediate compliance was impossible, and that compliance without a reasonable opportunity and a reasonable amount of time for readjusting or causing to be readjusted the gas appliances of its consumers would involve the most serious menace to life and property.

90. Ever since June 2, 1923, it has been, still is, and will continue to be commercially impossible for the plaintiff to comply with the requirement of chapter 899 that gas of not less than 650 British thermal units be furnished to the plaintiff's consumers, from and after the date of the taking effect of the said statute. Ever since June 2, 1923, it has been, still is, and will continue to be an absolute physical impossibility for the plaintiff, under the practical conditions obtaining in different portions of its distribution territory, to comply with this requirement and physically impossible for the plaintiff to manufacture and distribute to its consumers gas which will not, on occasions, fall below 650 British thermal units per cubic foot under such actual conditions. To make it possible for the plaintiff to furnish to all of its consumers on its distributing system gas conforming to the standard prescribed by the said provision, it would be

necessary for the plaintiff to manufacture gas of a much higher British thermal content than the minimum prescribed by the said provision, and the maximum British thermal content at which gas would have to go out from the plaintiff's plant in order that gas of not less than 650 British thermal units may be delivered at the point on the plaintiff's distributing system where the greatest variation occurs from the thermal content of such gas as sent out from the plant, must determine the thermal content at which all the gas furnished to the plaintiff's consumers must be produced and sent out, to the end that at no point on the plaintiff's distributing system where gas may be measured under normal conditions of temperature and atmospheric pressure may the gas furnished fall below the statutory standard. The production and sending out of all the gas sold by the plaintiff at a thermal content adequate to maintain the maximum requirement of comparatively few points on its distributing system would be commercially impracticable, wasteful of material and labor, preventive of adequate and efficient service to the great majority of the plaintiff's consumers, expensive beyond a point where any charge made to the plaintiff's consumers for gas service would be reasonable to them, and productive of no benefit to the plaintiff's consumers or to the plaintiff.

91. Ever since June 2, 1923, it has been, still is, and will continue to be impossible for the plaintiff to produce, for distribution to its consumers, gas of the maximum thermal content required to comply with chapter 899 of the Laws of 1923, without producing wide variations in the heating content of the gas supplied, and without a resulting unsatisfactory service. Gas of high heating content, such as that prescribed by the said statute, contains larger percentages of condensible hydrocarbons than gas of a lower heating value, such as that prescribed by the commission's order of August 30, 1922, in case No. 108. Even if gas of such high heating content were produced with a fair degree of uniformity at the plant, it would be unavoidably affected by changing temperature conditions in the holders and street mains, resulting in a variable and unsatisfactory service to the consumers of the plaintiff. The heat content prescribed by the said statute is exceptionally high, and gas supplied with such heat content, which had been subjected to such temperature changes beyond the control of the plaintiff, when applied to cooking utensils, incandescent lighting mantles,

the interior of ranges and room heaters, and all other heated surfaces, such as boiler tubes and water heater coils, would not be completely consumed, thereby causing such heated surfaces to become coated with an increasing deposit of carbon, and a large percentage of the efficiency of such gas would be lost, and serious hazards to life and property created.

92. The provisions of chapter 899 of the Laws of 1923 undertake or purport to require a standard of not less than 650 British thermal units per cubic foot to be maintained on every part of the distributing system of the plaintiff and throughout its territory, where the gas is measured under normal conditions of temperature and atmospheric pressure, but the said provisions nowhere define what are normal conditions of temperature and atmospheric pressure and the variety of conditions of temperature and atmospheric pressure which obtain at different times of the year and at different places on the distributing system of the plaintiff make it impossible to define or fix what are "normal conditions of temperature and atmospheric pressure," within the meaning of the said provision.

93. The provisions of chapter 899 of the Laws of 1923, that a gas corporation engaged in the business of manufacturing, furnishing, or selling illuminating gas in a city containing a population of 1,000,000 or over shall not charge or receive for gas furnished or sold in such city a sum per 1,000 cubic feet in excess of $1, nor furnish in such city gas of less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure, are not separable. The rate fixed by chapter 899 of the Laws of 1923 is $1 per 1,000 cubic feet for gas of the specified quality, and the requirement of a minimum thermal content is an integral part of the attempted limitation on the plaintiff's rates, and the whole provision is confiscatory, unconstitutional, discriminatory, and void, for reasons hereinbefore set out.

94. The plaintiff has no adequate remedy, except by an action in equity.

95. Various matters comprised within the issues referred to me by the order of October 11, 1923, I have discussed in a separate opinion, which is herewith submitted and made a part of this report. It is my intention that the facts and the conclusions regarding the law, set forth or referred to for reasons of convenience in that separate document, shall be deemed a part hereof, with the same force

and effect as though they had been physically incorporated in this report.

I therefore recommend as follows:

1. That it be adjudged and decreed that a maximum rate of $1 per 1,000 cubic feet of gas sold by the plaintiff, in conjunction with or apart from the said standard of 650 British thermal units per cubic foot, is illegal and void, because in contravention of the Fourteenth Amendment of the Constitution of the United States, and that the provisions of the said chapter 480 of the Laws of 1910 of the state of New York, known as the Public Service Commission Law, as amended and supplemented, and of chapter 899 of the Laws of 1923, in so far as they prohibit the plaintiff from charging or receiving for gas manufactured and sold in the borough of Richmond, county of Richmond, city of New York, a sum per 1,000 cubic feet in excess of the rate of $1 per 1,000 cubic feet, in conjunction with or apart from the said standard, are each likewise illegal and void.

2. That it be adjudged and decreed that the provisions of the said chapter 480 of the Laws of 1910 as amended and supplemented and the order of the Public Service Commission of August 30, 1922 (both as amended and modified by chapter 898 of the Laws of 1923), only in so far as they operated to prohibit the plaintiff from making or imposing a charge for gas supplied in excess of a rate of $1.20 per 1,000 cubic feet, or in excess of the graduated rates prescribed by the order of the commission of August 30, 1922, are each likewise illegal and void.

3. That it be adjudged and decreed that a standard of gas, required to be furnished by the plaintiff, of not less than 650 British thermal units per cubic foot, in conjunction with a rate not exceeding $1 per 1,000 cubic feet of gas, is likewise illegal and void, and the provisions of the said chapter 480 of the Laws of 1910, as amended and supplemented, and of chapter 899 of the Laws of 1923, in so far as they prohibit the plaintiff from furnishing gas of a standard less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure, in conjunction with the rate prescribed thereby, are likewise illegal and void.

4. That it be adjudged and decreed that the provisions of chapter 480 of the Laws of 1910, as amended and supplemented, and of chapter 899 of the Laws of 1923, in so far as they prohibited or prohibit the plaintiff from furnishing gas of a standard less than 650 British thermal units per cubic foot, without affording the plaintiff an opportunity and a reasonable time within which to make, or to have its consumers make, such readjustment of and changes in the gas appliances of the consumers as might be necessary in order to adapt them for the safe and efficient use of gas of such standard and to protect the consuming public against the very obvious and serious dangers to human life and property, or in so far as they denied to the plaintiff a safe and adequate judicial review of the legality thereof without incurring the penalties provided by the said statutes, are likewise illegal and void.

5. That it be adjudged and decreed that the said chapter 480 of the Laws of 1910, as amended and supplemented, or any other provisions of law, or any regulation prescribed thereunder, in so far as it prohibits the plaintiff from putting into effect forthwith a rate for gas distributed or sold by it less than that which will afford to it just compensation therefor, is likewise illegal and void.

6. That it be adjudged and decreed that the plaintiff has no adequate remedy at law for the injury which will result from the enforcement of said acts, and that such injury will be irreparable.

7. That it be adjudged and decreed that the plaintiff be granted a permanent injunction, issuing out of and under the seal of this honorable court, against the defendants and each of them, and their and each of their successors in office, their deputies and attorneys, and their and each of their successors, servants, and employés, and any and every person acting or purporting to act under or by virtue of the authority of chapter 480 of the Laws of the state of New York of 1910, as amended and supplemented, or any other or different provisions of law:

(1) From in any way enforcing or attempting to enforce against the plaintiff a rate for gas furnished by the plaintiff to its general consumers of not more than $1 per 1,000 cubic feet of gas sold, under the provisions of the said acts or otherwise.

(2) From in any way enforcing or attempting to enforce against the plaintiff the provisions of the said acts, in so far as they prohibit the plaintiff from charging or receiving for gas furnished in the borough of Richmond, county of Richmond, city of New York, a sum per 1,000 cubic feet in excess of $1 in conjunction with or apart from the said standard of gas.

(3) From in any way enforcing, or attempting to enforce, against the plaintiff,

the provisions of the said chapter 480 of the Laws of 1910 as amended and supplemented (and chapter 898 of the Laws of 1923), and the order of the Public Service Commission of August 30, 1922, only in so far as they operated to prohibit the plaintiff from making or imposing a charge for gas supplied in excess of a rate of $1.20 per 1,000 cubic feet, or in excess of the graduated rates prescribed by the order of the Commission of August 30, 1922.

(4) From enforcing or attempting to enforce against the plaintiff a standard of gas furnished by the plaintiff of not less than 650 British thermal units per cubic foot, or the provisions of the said acts in so far as they prohibit the plaintiff from furnishing a gas of a standard less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure.

(5) From bringing any action or proceeding to enforce the said penalties against the plaintiff, or by mandamus or injunction or otherwise, to compel compliance by the plaintiff with the provisions of the said acts, or any of them, relative to the said maximum rates or charges.

(6) From doing any act or thing interfering with the right or authority of the plaintiff forthwith to furnish gas of any standard which it may lawfully furnish, and to charge or receive for gas furnished by it any rate which it may lawfully charge or receive, any provisions of the said acts or of any regulations prescribed thereunder relative to the rate to be charged and received or to the standard of gas to be furnished by the plaintiff to the contrary notwithstanding.

8. That it be adjudged and decreed that, at any time while the injunction herein granted remains in force, any party hereto or his or its successors or assigns, may apply by notice at the foot thereof, to vacate, modify, or extend the foregoing injunction because of any change of circumstances since the entry hereof, or for any additional relief to which he or it may deem himself or itself entitled by reason of any acts or events occurring after the date of this decree.

9. That the plaintiff may have such other, further, or different relief as to the court may seem meet and the nature of the case may require.

William L. Ransom and Jacob H. Goetz, both of New York City, and Frank H. Innes, of New Brighton, N. Y. (Frank H. Innes, of New Brighton, N. Y., of counsel), for plaintiff.

Charles G. Blakeslee, of Binghamton, N. Y. (Melvin L. Krulewitch, of New York City, of counsel), for defendants constituting Public Service Commission.

John Holly Clark, Jr., of New York City, for Albert Ottinger as Attorney General.

Before MANTON, Circuit Judge, and CAMPBELL and INCH, District Judges, holding court pursuant to section 266 of the Judicial Code (Comp. St. § 1243).

PER CURIAM. This application is to confirm the report of the special master, who, after hearings and full consideration of the issues presented in this cause, in a carefully considered opinion, held that the plaintiff was entitled to judgment adjudging unconstitutional and void the provisions of chapters 898 and 899 of the Laws of 1923.

Chapter 898 provides: *"Service Charges Prohibited.* Every gas corporation shall charge for gas supplied a fair and reasonable price. No such corporation shall make or impose an additional charge or fee for service or for the installation of apparatus or the use of apparatus installed."

Chapter 899 provides: *"Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The Public Service Commission, notwithstanding any other provisions of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum."

After these enactments became effective, and on July 2, 1923, a temporary restraining order was granted by the District Court on the plaintiff's application and after issue was joined. The claim of unconstitutionality as to both statutes is based upon the argument that, if the rate fixed by the statute were enforced and the service charge eliminated, it would result in a confiscation of plaintiff's property. At the hearing before the master, the plaintiff, in support of its claim, offered proof as to its operating cost for the quality of gas actually manufactured. It also offered proof as to the reproduction

cost and present value of its property. The master found the actual net cost, inclusive of the federal income tax, aside from any return on the property, to be .9804 cents per 1,000 feet of gas sold, for 12 months ending November 30, 1924, 1.04 cents for 1923, and 1.115 cents for 1922. The fair value of the property, including the working capital and going value as of June 1, 1923, was fixed at $4,750,000, $4,785,000 as of December 31, 1923, and $5,233,869, as of October 31, 1924. In reaching these figures, the master also took into consideration the valuations of the manufacturing plant, holders, land values, buildings, mains, meters, general equipment of tools and implements.

Exceptions have been filed by both the plaintiff and defendants. The plaintiff takes exception to the failure of the master to reach a higher sum, to wit, $5,895,247 as of June 1, 1923; its contention is that this was the reproduction cost of the property of the plaintiff and that the master was in error at fixing the reproduction cost at $5,164,021, and then the value at $4,750,000. It also complains of the master fixing $700,000 for undistributed structural costs, and says that the uncontradicted evidence required an allowance for such elements of reproduction cost of at least $1,114,814; that the plaintiff should have been allowed reasonably $344,146 as working capital. The defendant Public Service Commission filed exceptions to the finding that (1) the respective acts were unconstitutional; (2) that the master has found an excessive amount as to the cost to reproduce plaintiff's property; (3) that the master failed to make deduction for accrued depreciation of plaintiff's property; and (4) that no amount should have been allowed for going concern. In addition to this, the Attorney General excepts to the master accepting as the cost to the plaintiff, as a basis, the finding in a prior rate-fixing case wherein the plaintiff's property was valued by judgment entered January 10, 1921.

[1, 2] The ascertainment of the fair value has been often stated not to be controlled by artificial rules. As has been said, it is not a matter of formulas, but represents the reasonable judgment having its basis in the proper consideration of all the material facts. Minn. Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Ga. Ry. & Power Co., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144. The master, in arriving at the figure of the fair value, considered the plaintiff's investment reproduction cost, the cost of the fixed

capital as shown by the books of account, including additions up to October 31, 1924. He took into consideration from the plaintiff's books of account an approximation of the original cost of the property, and in doing so considered what was found by the judgment of January 10, 1921, in the state Supreme Court as the fixed capital owned by the plaintiff and excluded the working capital there determined upon. To this he added the additions and betterments since that date. It was proper to add to this as part of the capital upon which a fair return should be earned, the item of going concern.

[3, 4] The issue which was presented in the former suit was passed upon by a court of competent jurisdiction. It was between the same parties, at least it was between the plaintiff and the defendants or persons in privity with them, for an incumbent of an office is in privity with his predecessor in the same office, and he is concluded by any judgment for or against his predecessor in any suit touching the powers and privileges or duties of his office. New Orleans v. Citizens' Bank, 167 U. S. 371, 17 S. Ct. 905, 42 L. Ed. 202; Starr v. Chicago Rock Island R. R. Co. (C. C.) 110 F. 3. A fair valuation was arrived at in the proceeding before the state Supreme Court as of the date therein fixed. This issue of fact presented in the prior litigation having been tried and determined, parties to such trial are estopped, even in the second suit and in a different cause of action, where the same question is presented from contending to the contrary, and from what was thus found and determined. Cromwell v. Sac. County, 94 U. S. 353, 24 L. Ed. 195; Last Mining Co. v. Tyler Mining Co., 157 U. S. 683, 15 S. Ct. 733, 39 L. Ed. 859. The exception to the receipt of this judgment and its consideration by the master is overruled.

[5] In fixing the fair value, the master properly allowed a suitable sum for going concern. That this may be taken into consideration as an element of property value is now settled. Omaha v. Omaha, 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084. And this is a property which cannot be taken, except by due process of law.

[6] The allowances fixed by the master for undistributed structural costs and for working capital are low. The uncontradicted testimony places this item at $1,114,814. The master fixed the sum of $700,000. These costs are for actual expenditures. They are inescapable outlays of money. They were principally construction overhead charges,

but they were actual costs, and go into the fair value, as would any material or labor costs. There is no testimony or fair inference leading to the conclusion that $700,000 only should be allowed. There must, therefore, be a modification of this allowance.

[7, 8] We have heretofore held that this statute fixing the rate and the standard of gas are inseparable, and that they must be read together, and that to fix a standard which may not be used with safety is an arbitrary and unreasonable exercise of police power. Kings Co. Lighting Co. v. Prendergast (D. C.) 7 F.(2d) 192, decided June, 1925. We adhere to that decision and its application to the facts disclosed by this record. Approving, as we do, with the above modifications, the valuations arrived at by the master, we likewise approve the recommendation of the master that the rate of return fixed by the statute here challenged, if applied to this plaintiff, would be confiscatory of its property. The enforcement of chapters 898 and 899 of the Laws of 1923, prohibiting a charge by the plaintiff for its gas above the respective amounts of $1.20 and $1, and forbidding a service charge, are each confiscatory, and as such are in violation of the provisions of the federal Constitution.

[9] In Kings County Light & Gas Co. v. Prendergast, supra, we approved a rate of return of not less than 8 per cent. as a reasonable rate of annual return. We think that return on the property of the plaintiff would be a fair return on an investment, and approve the conclusion of the master as to it also.

The master's report will be modified as indicated, and then confirmed.

### Final Decree.

I. Plaintiff's exception numbered (6) to the report and opinion of the special master, dated July 3, 1925, as filed herein, is sustained, and findings numbered 74, 76, and 80, in the report of the special master, and the portion of his opinion at printed pages 30 to 32 of the report (10 F.[2d] 177) under the caption "Working Capital," and at printed page 38 of the report (10 F.[2d] 179) under the caption "Reproduction Cost Established before Me," made a part of the report and findings, are modified, so as to find, and it is the finding of this court, that the reasonable and necessary working capital of the plaintiff in its gas business as of June 1, 1923, and as of the time of the report, was at least the sum of $344,146.

II. Plaintiff's exception numbered (8) to

the said report and opinion of the special master, as filed herein, is sustained; and findings numbered 73 and 76 in the report of the special master, and the portion of his opinion at printed pages 40 to 41 of the report (10 F.[2d] 180) under the caption "Undistributed Structural Costs," made a part of the report and findings, are modified, so as to find, and it is the finding of this court, that the cost to reproduce the property elements described as the undistributed structural costs, of the plaintiff, as of June 1, 1923, and as of the time of the report, amounted to at least the sum of $1,114,815, made up as follows:

| | |
|---|---:|
| Omissions and contingencies...... | $ 30,215.00 |
| Organization and development prior to construction................ | 245,000.00 |
| Financing ..................... | 250,000.00 |
| Engineering and superintendence and general contractor's expenses and profit ..................... | 351,532.00 |
| Interest during construction...... | 160,809.00 |
| Taxes during construction........ | 867.00 |
| Administrative, legal, and miscellaneous general expense during construction .................. | 76,391.00 |

III. Plaintiff's exception numbered (10) to the said report and opinion of the special master, as filed herein, is sustained to the extent hereinafter stated, and finding numbered 76 in the report of the special master, and the portion of his opinion at printed page 41 of the report (10 F.[2d] 180) under the caption "Undistributed Structural Costs," made a part of the report and findings, are modified, so as to find, and it is the finding of this court, that the reproduction cost of the property owned by the plaintiff and used and useful in its gas business, but exclusive of working capital and going value, was, as of June 1, 1923, at least the sum of $4,659,835.42; as of December 31, 1923, at least the sum of $4,694,047.88; and as of October 31, 1924, at least the sum of $5,142,- 917.67—and that such reproduction cost, inclusive of working capital and going value, was, as of June 1, 1923, at least the sum of $5,647,981.42; as of December 31, 1923, at least the sum of $5,682,193.88; and as of October 31, 1924, at least the sum of $6,131,- 063.67.

IV. Plaintiff's exception numbered (11) to the said report and opinion of the special master, as filed herein, is sustained, to the extent hereinafter stated, and findings numbered 77 and 79 in the report of the special master, and the portion of his opinion at printed page 42 of the report (10 F.[2d] 180) under the caption "Conclusions as to Value,"

made a part of the report and findings, are modified, so as to find, and it is the finding of this court, that the present value of the plaintiff's property used and useful in its gas business was, as of June 1, 1923, at least the sum of $5,233,960; as of December 31, 1923, at least the sum of $5,268,960; and as of October 31, 1924, at least the sum of $5,-717,829—and that upon such sums, respectively, the plaintiff was entitled to earn, through rates chargeable by it for gas, a fair return.

V. Plaintiff's exception numbered (13) to the said report and opinion of the special master, as filed herein, is sustained to the extent hereinafter stated, and finding numbered 80 in the report of the special master is modified, so as to find, and it is the finding of this court, that the cost to the plaintiff of all of the fixed capital required by it, as shown by its books of account, together with working capital in the amount of $344,146, and going value in the amount of $644,000, was, as of December 31, 1922, $4,661,498.86; as of June 1, 1923, $4,727,697.30; as of December 31, 1923, $4,937,427.55; and as of October 31, 1924, $5,281,824.33.

VI. The other exceptions filed herein by the plaintiff, and all the exceptions filed by the respective defendants to the said report and opinion of the special master, are hereby severally overruled.

VII. The report and opinion of the special master, filed herein July 3, 1925, as modified in the respects and to the extent herein indicated, are hereby confirmed.

VIII. A maximum rate of $1 per 1,000 cubic feet of gas sold by the plaintiff, in conjunction with or apart from the standard of 650 minimum British thermal units per cubic foot, is illegal and void, because in contravention of the Fourteenth Amendment of the Constitution of the United States, and the provisions of chapter 480 of the Laws of 1910 of the state of New York, known as the Public Service Commission Law, as amended and supplemented, and of chapter 899 of the Laws of 1923, in so far as they prohibit the plaintiff from charging or receiving for gas manufactured and sold in the borough of Richmond, county of Richmond, city of New York, a sum per 1,000 cubic feet in excess of the rate of $1 per 1,000 cubic feet, in conjunction with or apart from the said standard, are each likewise illegal and void.

IX. A maximum rate of $1.20 per 1,000 cubic feet of gas sold by the plaintiff is illegal and void, because in contravention of the Fourteenth Amendment of the Constitution of the United States, and the provisions of the said chapter 480 of the Laws of 1910, as amended and supplemented, and of the order of the Public Service Commission of August 30, 1922 (both as amended and modified by chapter 898 of the Laws of 1923), only in so far as they operated to prohibit the plaintiff from making or imposing a charge for gas supplied in excess of a rate of $1.20 per 1,000 cubic feet or in excess of the graduated rates prescribed by the said order of the Commission of August 30, 1922, are each likewise illegal and void.

X. A standard of gas, required to be furnished by the plaintiff, of not less than 650 British thermal units per cubic foot, in conjunction with a rate not exceeding $1 per 1,000 cubic feet of gas, is likewise illegal and void, and the provisions of the said chapter 480 of the Laws of 1910, as amended and supplemented, and of chapter 899 of the Laws of 1923, in so far as they prohibit the plaintiff from furnishing gas of a standard less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure, in conjunction with the rate prescribed thereby, are likewise illegal and void.

XI. The provisions of chapter 480 of the Laws of 1910, as amended and supplemented, and of chapter 899 of the Laws of 1923, in so far as they prohibited or prohibit the plaintiff from furnishing gas of a standard less than 650 British thermal units per cubic foot, without affording the plaintiff an opportunity and a reasonable time within which to make, or to have its consumers make, such readjustment of and changes in the gas appliances of the consumers as might be necessary in order to adapt them for the safe and efficient use of gas of such standard and to protect the consuming public against the very obvious and serious dangers to human life and property, or in so far as they denied to the plaintiff a safe and adequate judicial review of the legality thereof without incurring the penalties provided by the said statutes, are likewise illegal and void.

XII. The said chapter 480 of the Laws of 1910, as amended and supplemented, or any other provisions of law, or any regulation prescribed thereunder, in so far as it prohibits the plaintiff from putting into effect forthwith a rate for gas distributed or sold by it less than that which will afford to it just compensation therefor, is likewise illegal and void.

XIII. The plaintiff has no adequate remedy at law for the injury which will result

from the enforcement of the said acts, and such injury will be irreparable.

XIV. The defendants William A. Prendergast, William R. Pooley, Charles Van Voorhis, George R. Van Namee, and George R. Lunn, constituting the Public Service Commission of the state of New York, and Albert Ottinger, as Attorney General of the state of New York, and each of them, and each of their successors in office, their deputies and attorneys, and their and each of their successors, servants and employees, and any and every person acting or purporting to act under or by virtue of the authority of chapter 480 of the Laws of the state of New York of 1910, as amended and supplemented, or any other or different provisions of law, be, and each of them is, hereby restrained and enjoined:

(1) From in any way enforcing or attempting to enforce against the plaintiff a rate for gas furnished by the plaintiff to its general consumers of not more than $1 per 1,000 cubic feet of gas sold, under the provisions of the said acts or otherwise.

(2) From in any way enforcing or attempting to enforce against the plaintiff the provisions of the said acts, in so far as they prohibit the plaintiff from charging or receiving for gas furnished in the borough of Richmond, county of Richmond, city of New York, a sum per 1,000 cubic feet in excess of $1, in conjunction with or apart from the said standard of gas.

(3) From in any way enforcing or attempting to enforce against the plaintiff a rate for gas furnished by the plaintiff to its general consumers of not more than $1.20 per 1,000 cubic feet of gas sold, under the provisions of the said acts or otherwise, and from in any way enforcing or attempting to enforce, against the plaintiff, the provisions of the said chapter 480 of the Laws of 1910, as amended and supplemented (and chapter 898 of the Laws of 1923), and the order of the Public Service Commission of August 30, 1922, only in so far as they operated to prohibit the plaintiff from making or imposing a charge for gas supplied in excess of a rate of $1.20 per 1,000 cubic feet, or in excess of the graduated rates prescribed by the order of the commission of August 30, 1922.

(4) From enforcing or attempting to enforce against the plaintiff a standard of gas furnished by the plaintiff of not less than 650 British thermal units per cubic foot, or the provisions of the said acts in so far as they prohibit the plaintiff from furnishing a gas of a standard less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure.

(5) From bringing any action or proceeding to enforce the said penalties against the plaintiff, or by mandamus or injunction or otherwise, to compel compliance by the plaintiff with the provisions of the said acts, or any of them, relative to the said maximum rates or charges.

(6) From doing any act or thing interfering with the right or authority of the plaintiff forthwith to furnish gas of any standard which it may lawfully furnish, and to charge or receive for gas furnished by it any rate which it may lawfully charge or receive, any provisions of the said acts or of any regulations prescribed thereunder relative to the rate to be charged and received or to the standard of gas to be furnished by the plaintiff to the contrary notwithstanding.

XV. At any time while the injunction herein granted remains in force, any party hereto, or his or its successors or assigns, may apply by notice at the foot hereof, to vacate, modify, or extend the foregoing injunction because of any change of circumstances since the entry hereof, or for any additional relief to which he or it may deem himself or itself entitled by reason of any acts or events occurring after the date of this decree.

XVI. Nothing contained herein shall be construed to limit, prejudice, or restrict the exercise of the jurisdiction and power of the Public Service Commission of the state of New York under chapter 480 of the Laws of 1910, as amended and supplemented, known as the Public Service Commission Law, or any other provisions of law, not inconsistent with the provisions of this decree.

XVII. The plaintiff shall recover of and from the defendants its taxable costs and disbursements, including the sum fixed and allowed as the compensation of the special master herein, to be equally borne and paid by the defendants, in accordance with the rules of the Supreme Court of the United States on this subject.